1

2                **UNITED STATES DISTRICT COURT**

3                     **DISTRICT OF OREGON**

4                     **PORTLAND DIVISION**

5

6  CHRISTOPHER J. BUYES,              )

7                 Plaintiff,          )    No. 03:11-cv-00487-HU
                                      )
8  vs.                                )
                                      )
9  MICHAEL J. ASTRUE,                 )    **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,   )
10                                    )
                 Defendant.           )
11
                   _____
12

13

14 Lisa R. Porter
   KP Law LLC
15 16200 SW Pacific Hwy, Suite H-233
   Portland, OR 97224
16
        Attorneys for Plaintiff
17

18 S. Amanda Marshall
   United States Attorney
19 Adrian L. Brown
   Assistant United States Attorney
20 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
21

22 David Morado
   Regional Chief Counsel, Region X, Seattle
23 J. Ricardo Hernandez
   Special Assistant United States Attorney
24 Social Security Administration
   Office of the General Counsel
25 1301 Young Street, Suite A702
   Dallas, TX 75202
26
        Attorneys for Defendant
27

28

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Christopher J. Buyes seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his applications for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. Buyes argues the Administrative Law Judge ("ALJ") erred in finding Buyes's impairments do not meet or medically equal any Listed impairment; failing to evaluate his mental impairments properly; failing to follow the proper steps in determining his residual functional capacity; and improperly relying on the testimony of a Vocational Expert. *See* Dkt. ## 23 & 30.

## I.  PROCEDURAL BACKGROUND

Buyes protectively filed his applications for SSI and DI benefits on May 22, 2007, at age 51, claiming disability since July 2, 2005, due to "[l]ower back problems, mental health issues (severe depression, PTSD, borderline personality disorder), alcoholism . . .[,] [c]arpol [sic] tunnel on right arm, [and] bursitis in both knees." (A.R. 158; 135-45[1]) Buyes's applications were denied initially and on reconsideration. (A.R. 42-45) He requested a hearing, and a hearing was held on March 5, 2010,

---

[1] The administrative record was filed electronically using the court's CM/ECF system. Dkt. #9 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #9-6, Page 2 of 19); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

1  before an ALJ.  Buyes testified on his own behalf, and a Vocational
2  Expert ("VE") also testified.  (A.R. 32-86)  On April 2, 2010, the
3  ALJ issued his decision, denying Buyes's applications for benefits.
4  (A.R. 8-20)  Buyes appealed the ALJ's decision, and on March 2,
5  2011, the Appeals Council denied his request for review (A.R. 1-3),
6  making the ALJ's decision the final decision of the Commissioner.
7  *See* 20 C.F.R. §§ 404.981, 416.1481.  Buyes filed a timely Complaint
8  in this court seeking judicial review of the Commissioner's final
9  decision denying his applications for benefits.  Dkt. #2.  The
10 matter is fully briefed, and the undersigned submits the following
11 findings and recommended disposition of the case pursuant to 28
12 U.S.C. § 636(b)(1)(B).

13

14                    *II.  FACTUAL BACKGROUND*

15              *A.  Summary of the Medical Evidence*

16      Buyes was seen in the emergency room on November 10, 2003, for
17 suicidal ideation and depression.  He was noted to be tearful,
18 stating he did not know what was wrong.  He stated he had held a
19 shotgun to his mouth and pulled the trigger, but the gun was not
20 loaded.  He complained of being up and down emotionally for months,
21 and he was "at the end of [his] rope."  (A.R. 335)  He had not
22 eaten in two or three days, stating he would throw up every time he
23 attempted to eat something.  (*Id.*)  He reported drinking up to a
24 full case of beer every day, and occasionally smoking marijuana,
25 most recently two to three days earlier.  The E.R. records are
26 incomplete, omitting the assessment, treatment, and discharge
27 portions of the records.  (A.R. 335-42)

28

3 - FINDINGS & RECOMMENDATION

On July 2, 2004, Buyes was seen in the emergency room after being involved in a rollover accident the previous evening. Notes indicate he was driving a pickup, and was wearing a seat belt. He thought he remembered seeing "two bright lights," and the next thing he knew, his truck was in a ditch. He was picked up and transported home by passersby, and his family took him to the E.R. the next morning. He complained of mild nausea, and mild pain in his neck, left wrist, and low back. He had a laceration on his scalp above the left eyebrow, and dried blood on his forearm. He was noted to have "a gaping open wound on the left superior orbital rim," and dried blood at his nose. He was treated with Phenergan for nausea, and a neck brace. (A.R. 325-33) Although he denied drinking, lab tests indicated he was intoxicated, "with alcohol still on the board at 167." (A.R. 333) He was transferred to Legacy Emmanuel Hospital for inpatient evaluation. (*Id.*) Records of the evaluation are not part of the administrative Record; however, as discussed below, it appears Buyes entered a chemical dependency treatment program following this incident.

On January 3, 2005, Buyes was seen for an initial assessment by a Licensed Professional Counselor through the Yamhill County Adult Mental Health Program. (A.R. 533-38) Notes indicate Buyes was involved in chemical dependency treatment, and had been referred by his counselor "on an emergency basis, for assistance with severely depressed mood." (A.R. 533) Buyes stated he was experiencing wide mood swings, crying one minute and feeling very angry the next. Buyes stated he was a high school graduate. He was married for twenty-two years, and had two grown daughters. He and his wife divorced, and subsequently, Buyes had a seven-year

4 - FINDINGS & RECOMMENDATION

1  relationship that ended due to his drinking problem.  During the
2  assessment, Buyes exhibited a depressed affect, but was cooperative
3  with the evaluator.  He reported symptoms including sleep difficul-
4  ties, poor appetite, social withdrawal, problems concentrating,
5  anxiety, and alcohol abuse.  The evaluator estimated Buyes's
6  current GAF at 52[2], and listed Buyes's likely diagnoses as Major
7  Depressive Disorder, moderate; and Bipolar Disorder with rapid
8  cycling.  Buyes was deemed eligible to participate in the Adult
9  Mental Health Program, and was scheduled for initial evaluation by
10 a psychiatrist.  (A.R. 533-38)

11     On January 20, 2005, Buyes saw a doctor at Virginia Garcia
12 Memorial Health Center ("VGMHC") to establish care as a new
13 patient.  He wanted a prescription for Paxil, and he also had some
14 lesions that needed draining.  He had just been released from
15 treatment for alcohol abuse, and he had been sober for one week.
16 He felt his depression had increased.  He had thoughts of suicide,
17 but no definite plan.  He was diagnosed with bipolar disorder, and
18 received prescriptions for Lithium and Paxil. (A.R. 387)

19     Buyes returned to VGMHC for followup on February 2, 2005.  His
20 abscesses were healed completely.  He complained of chronic lower
21 back pain, and he was advised to use heat.  Buyes stated he was
22 "back to drinking." (A.R. 386)  He also stated he had no money to

23

24     [2]The Global Assessment of Functioning, or "GAF" scale, "is
   used to report a clinician's judgment of the patient's overall
25 level of functioning on a scale of 1 to 100.  A GAF of 51-60
   indicates moderate symptoms (*e.g.,* flat affect and circumstantial
26 speech, occasional panic attacks or moderate difficulty in social,
   occupational, or school functioning)."  *Raegen ex rel. Syzonenko v.*
27 *Astrue*, slip op., No. 10-CV-401-BR, 2011 WL 1756131, at *5 n.3
   (D. Or. May 9, 2011) (Brown, J.) (citing *Diagnostic and Statistical*
28 *Manual of Mental Disorders IV* (DSM-IV) 31-34 (4th ed. 2000)).

5 - FINDINGS & RECOMMENDATION

1 pay for his psychiatric medications. (*Id.*) Buyes was vaccinated

2 for Hepatitis B on April 14 and May 31, 2005. (A.R. 384-85)

3    On March 31, 2005, Buyes underwent a Comprehensive Psychiatric

4 Assessment by psychiatrist Holly Hoch, M.D. through the Yamhill

5 County Adult Mental Health Program. (A.R. 529-31) Buyes again was

6 involved in chemical dependency treatment, and reportedly had been

7 sober for two to three weeks. He had been referred to Dr. Hoch

8 "for treatment of depressive symptoms." (A.R. 529) Buyes

9 described a long history of depression and alcohol dependence,

10 beginning in his teen years. Dr. Hoch had not yet received Buyes's

11 past mental health treatment records to review, but based on

12 Buyes's description of his symptoms and history, she diagnosed him

13 with Major Depressive Disorder (provisional), and Alcohol Depen-

14 dence in early remission. (A.R. 530) She started Buyes on

15 Buproprion XL, and directed him to continue in individual and group

16 therapy, returning for followup in one month. (A.R. 531)

17    Buyes missed a scheduled appointment with Dr. Hoch on

18 April 28, 2005. (A.R. 544)

19    On June 13, 2005, Buyes saw family practitioner Marion

20 Reynolds, M.D. at VGMHC. Buyes stated he had hit his ankle with an

21 axe while chopping wood about a week earlier. The wound was

22 superficial, but also produced extensive bruising. Buyes was able

23 to stand and walk without difficulty, and the wound was noted to be

24 healing. He was referred for an x-ray to evaluate a suspected

25 hematoma. (A.R. 383)

26    Buyes saw Dr. Hoch for followup on July 6, 2005. She noted

27 she had not seen Buyes since his initial evaluation in March.

28 Buyes reported that he had stopped taking the Buproprion after

6 - FINDINGS & RECOMMENDATION

about a week because he "felt like his skin was crawling." (A.R. 542) He had started taking Paxil again, which he was getting from a friend, and he was staying clean and sober. He reported recent nightmares about being abused by family members. Buyes was noted to be "fairly emotional," becoming tearful when he discussed his past abuse, and "his difficulties in the past year and since being jobless and losing a healthy income." (*Id.*) Dr. Hoch noted Buyes's thought process "jump[ed] around a bit." (*Id.*) The doctor still had not received any past treatment records. She had Buyes complete a new form to get his records. She provided Buyes with samples of Paxil, and directed him to complete a patient assistance form so they could try to get his medication costs covered. She recommended Buyes meet with counselor Bruce Neben regularly for individual therapy. (A.R. 543) Dr. Hoch noted Buyes might need a mood stabilizer, but she wanted to review his past records before making that determination. (*Id.*)

On August 8, 2005, Buyes was seen at the Yamhill County Correctional Facility when an officer described him as "suicidal." Buyes had been off Paxil for almost a week. He appeared "very anxious"; cried easily and often; his hands were trembling; and his words were "spilling over." (A.R. 260) He denied current suicidal ideation or plan. He was assessed with severe depression, with a history of Bipolar Disorder and alcohol abuse. He was given a prescription for Paxil-CR 12.5 mg., two tablets per day. (*Id.*)

On September 24, 2005, Buyes was seen at the Yamhill County Correctional Facility with complaints of bleeding gums above his eye tooth, and tooth pain due to a filling falling out. Buyes's teeth were noted to be in "fair to poor repair," and his gum was

receded, swollen, bleeding, and tender.  He had lost part of a filling in a molar.  He was assessed with a partial abscess and a broken filling, and was referred to a dentist.  (A.R. 259)

Buyes saw Dr. Hoch again on November 9, 2005, for medication management.  Notes indicate Dr. Hoch had last seen Buyes in July 2005.  Since that time, he had spent two months in jail after an alcohol relapse.  He had been out of jail for about three weeks, and was remaining sober.  Dr. Hoch had prescribed Paxil for Buyes in July, and he had been able to continue taking the medication while in jail.  He was finding the medication "extremely helpful in terms of cutting down anxiety and nightmares," despite "some sexual dysfunction with it."  (A.R. 539)  He did not have funds to buy the medication, and the doctor was able to provide a coupon for thirty days of free medication.  She directed Buyes to complete patient assistance forms as soon as possible.  She also directed him to continue followup with counselor Bruce Neben, and meet with his primary care physician "to discuss whether Antabuse or other medications might be options for him."  (*Id.*)

Buyes returned to see Dr. Hoch on December 14, 2005, for medication management.  Buyes reported significant benefit from Paxil, despite sexual dysfunction side effects.  The medication was "helping him to move toward employment, stay[] sober, etc."  (A.R. 532)  Paxil was continued without change.  (*Id.*)

On November 30, 2005, Buyes was seen in the emergency room after falling from a step.  X-rays showed a fracture of the left proximal fibula, but no fracture of his ankle.  His leg was splinted, and he was given crutches to keep weight off of his leg, and a prescription for a narcotic pain medication.  He was told to

8 - FINDINGS & RECOMMENDATION

keep his leg elevated, and to use ice for two to three days. He was scheduled for an orthopedic recheck in one week. (A.R. 316-24) However, his next documented doctor's visit was on December 22, 2005, by a doctor at the Yamhill County Correctional Facility, for followup of a "fractured fibula." Buyes reported breaking his leg a couple of weeks earlier, and he was wearing a hard plastic splint. He had received narcotic pain medication at the time of the incident and had been put on crutches, but his crutches were not allowed in the jail. Due to his incarceration, he had missed his appointment for followup x-rays, casting, and possible surgery, and he had run out of pain medication. He received a prescription for Ibuprofen 800 mg three times daily for ten days, as needed, and he was moved to a lower bunk on the ground floor until his leg healed. X-rays were obtained on December 28, 2005, and showed "[e]arly healing of a small avulsion fracture of the posterior malleolus of the tibia with callous formation. Small superiosteal avulsion at the tip of the medial malleolus. No definite widening of the ankle mortis[.]" (A.R. 261; *see* A.R. 258, 262)

In March 2006, Buyes was seen at the Yamhill County Correctional Facility with complaints of constipation and bloating. He was treated with Milk of Magnesia, but complained that his stomach was "still bloated and tender." (A.R. 273-74)

On April 19, 2006, after his release from jail, Buyes was seen by a physical therapist for complaints of "low back pain, leg weakness and knee pain . . . causing him difficulty and limiting his functional abilities." (A.R. 285) Notes indicate he had a history of "3 herniated discs and repair," as well as "Bilateral knee bursitis." (*Id.*) Buyes stated his herniated discs and

9 - FINDINGS & RECOMMENDATION

1  resulting surgery were due to work-related injuries sixteen to
2  seventeen years earlier.  He stated he had worked for many years in
3  positions requiring him to lift 100 to 120 pounds, but he was no
4  longer able to do that much lifting.  He reported back pain with
5  bending, twisting, and lifting, and also knee pain and popping with
6  repetitive knee bending.  (*Id.*)  Buyes underwent "a two-hour
7  physical capacity examination with continuous cardiac monitoring."
8  (*Id.*)  He was noted to have normal posture, and he moved around
9  without difficulty.  His grip strength was somewhat decreased on
10 the right, with valid effort on the test, but his "rapid exchange
11 grip" testing was considered to be invalid.  (A.R. 286-87)
12 Sustained grip was normal on both sides.  (A.R. 287)

13     Buyes's ranges of motion were tested in accordance with
14 established AMA protocols.  His test results were considered valid.
15 His lumbar ranges of motion all were below normal, with more
16 deviation on the left than on the right.  (A.R. 288)  Lift testing
17 also was considered valid, with some deviations, as discussed in
18 the quoted note, below.  (A.R. 289-91)

19     Based on all of the test results, the evaluator opined Buyes
20 had a "whole person impairment level [of] 4%" based on applicable
21 AMA guidelines.  (A.R. 292)  The evaluator offered the following
22 opinions regarding Buyes's work-related functional abilities:

23          Lifting is not tolerated well.  When the item
            can be managed close to the body with no
24          awkward positioning, he is able to tolerate
            occasional light lifts. If bending, stooping,
25          crouching or twisting are involved then low
            back pain increases.   Light lifting to
26          shoulder height is tolerated occasionally.
            The client could benefit from improved lifting
27          mechanics.

28          .    .    .

10 - FINDINGS & RECOMMENDATION

1
2
3

> The client tolerated walking, reaching, and
> grasping tasks well. Stair climbing was tol-
> erated for short periods. Bending, squatting,
> twisting, crawling and kneeling were not
> tolerated well and increased pain in the low
> back and in knees.

4

5 (A.R. 292-93)  Testing indicated Buyes could sit, stand, and walk,

6 but would have difficulty kneeling.  He tolerated dexterity tasks

7 well, except when he was required to bend, crouch, or kneel.  He

8 demonstrated a medium level of fitness on cardiovascular testing.

9 (A.R. 293)  The evaluator found Buyes had given a valid effort

10 overall during the testing process.  (*Id.*)

11    Buyes saw Dr. Hoch on August 15, 2006, for a new Comprehensive

12 Psychiatric Assessment.  (A.R. 547-50)  Notes indicate Buyes's case

13 had been closed when he was incarcerated for six months.  He wanted

14 to resume participation in the Yamhill County Adult Mental Health

15 Program, and resume taking Paxil, which he had taken until about a

16 month earlier when he ran out of the medication.  Buyes reported

17 "excellent benefit with [Paxil] in that he [was] able to keep his

18 mood 'even keeled.'"  (A.R. 547)  He stated the medication helped

19 him think before speaking, not get emotional about unimportant

20 things, and keep from becoming angry and acting out.  He stated he

21 had been sober for nine months, and was considering an outpatient

22 treatment program to support his sobriety.  During the interview,

23 he became tearful easily, and he noted that when he was taking

24 Paxil, he did not have that type of tearful reaction. Dr. Hoch

25 diagnosed Buyes with Major Depressive Disorder, and Alcohol

26 Dependence in remission since December 2005.  (A.R. 549)  She

27 prescribed Paxil, and gave Buyes samples for eight weeks.  She

28 opined Buyes would benefit from some form of individual therapy.

11 - FINDINGS & RECOMMENDATION

1  She also opined Buyes would benefit from chemical dependency
2  treatment to support him in remaining sober and out of jail. (*Id.*)

3      Buyes returned to see Dr. Reynolds at VGMHC on October 17,
4  2006, for complaints associated with a urinary tract infection.
5  Medications were prescribed. (A.R. 381) He returned to see
6  Dr. Reynolds on October 31, 2006, and reported he had not had his
7  prescriptions filled due to his inability to pay for them. He now
8  had money and could get the medications. He complained of low,
9  left-sided back pain from "doing some physical work." (A.R. 380)
10 He exhibited tenderness to palpation of his left low back. He was
11 diagnosed with a left-sided strain, and Flexeril was prescribed.
12 He also received prescriptions for Paxil, and an antibiotic for his
13 urinary tract infection. (*Id.*)

14     On November 7, 2006, Buyes underwent a psychological evalua-
15 tion by psychologist Steven P. Barry, Ph.D. at the request of
16 Vocational Rehabilitation Services, to determine his "psychological
17 status and its implications for rehabilitation and employment."
18 (A.R. 294) Buyes was living with his niece and her husband after
19 being released from the Yamhill County Jail, where he had spent
20 five-and-a-half months on a probation violation that arose from
21 drinking alcohol. The incident for which he was on probation also
22 arose from drinking, when he got into a fight while drunk and ended
23 up spending 66 days in jail. (*Id.*)

24     Buyes graduated from high school in 1973, making average
25 grades (C and C-). He took some diesel mechanic classes at a
26 community college, but did not finish the program because he began
27 using alcohol and Thai stick (a form of marijuana). He began
28 taking Paxil intermittently a couple of years prior to a divorce,

12 - FINDINGS & RECOMMENDATION

and "off and on for "4, 5, 6 years. He might get to feeling better and stop it." At this time, he had been taking Paxil regularly for about a year, and noted it was keeping him "on an even keel." (A.R. 295)  Sometime in 2002, he had admitted himself to the hospital for suicidal feelings, arising from increasing arguments with his then-girlfriend, arguments with his children, unemployment, increased drinking, and not taking his medication. Most of his involvement with mental health treatment had been through Yamhill County Mental Health, where he saw a therapist for some kind of "anger management" treatment.  Buyes stated his probation officer wanted him "to get back into therapy," and he had an appointment scheduled for the next day.  (*Id.*)

Regarding his employment history, Buyes stated he was working twenty-four hours a week pumping gas, which he termed "a survival job."  (A.R. 296)  He also was helping a friend with building and framing.  He had worked as a mechanic for his girlfriend's cousin, and had operated a "mobile welding business" for awhile.  Dr. Barry noted Buyes's "work history became spotty and irregular in November, 1999 when his company was bought out by a Fortune 500 company and he quit."  (*Id.*)  The doctor found it "symbolic," and "not a coincidence," that Buyes quit this job, where he had worked for twenty-two years, on the date of his wedding anniversary. (*Id.*)

Buyes stated he had not consumed alcohol or other drugs since December 17, 2005.  He was in jail from that date until May 20, 2006, but had not used anything since his release.  He described life-long sleep problems, and a lack of any regular eating pattern or habit.  He had "little motivation or drive."  (*Id.*)  He noted

13 - FINDINGS & RECOMMENDATION

his mood was "more even" when he took his medication, and he was able to have fun with his grandson, but he "repeatedly mentioned things/activities he used to do, and [had] lost interest in pursuing[.]" (*Id.*)

Buyes stated he was involved in a vehicular rollover two-and-a-half years earlier, and "his mother and ex-girlfriend think he hasn't been the same since." (A.R. 297) He stated he forgets things, has a shorter attention and concentration span, and is less able to tolerate frustration. (*Id.*)

Dr. Barry observed that Buyes "appeared tired and depressed." (*Id.*) He answered questions consistently, and the doctor believed his responses validly indicated his psychological status and functioning. Buyes described himself as having severe depression, with "most of the classic and traditional traits and symptoms of depression," and stated he was easily angered to a moderately severe level. He described "a very, very high number of physical complaints, not all of which have a clear and known organic underpinning." (A.R. 298) Buyes stated he does not like people much, preferring to be alone. "He is easily hurt and slighted by real and perceived criticism and rejection. He views himself as such a loser, and so helpless and hopeless, that it is hard for him to make even the simplest decisions, let alone act on them." (*Id.*)

Dr. Barry offered several observations and suggestions based on his evaluation. He believed Buyes was suffering from depression, but not Bipolar Disorder, as had been noted in some of the Yamhill County jail records. He opined Buyes had been "significantly depressed since 1999," but also had experienced some level of depression even prior to that time, back into his teen years.

14 - FINDINGS & RECOMMENDATION

1  (*Id.*)  He noted Buyes had not treated his depression consistently,
2  only taking medications off-and-on.   Typically, when he began to
3  feel better, he would stop taking his medication. Dr. Barry opined
4  Buyes was not "totally invested in therapy," only going because his
5  probation officer expected him to go.   (A.R. 299)   The doctor
6  opined Buyes's condition likely was complicated by a traumatic
7  brain injury from the motor vehicle accident, and he opined there
8  would be little cognitive change in Buyes's condition with regard
9  to short-term memory and concentration deficits, and his inability
10 to tolerate frustration.  He noted that given the level of Buyes's
11 depression, and his very low self-esteem and self-view, a "pretty
12 proactive and prescriptive" approach would be appropriate, making
13 it clear what was expected of him in terms of "what, when, where,
14 [and] how."  (*Id.*)   He noted Buyes has some physical limitations,
15 but Buyes indicated he would like to work outside, in a job where
16 he did not have to deal with large numbers of people.

17     Dr. Barry recommended Buyes "take the proper anti-depressant
18 medication and get involved in therapy," as well as attending
19 Alcoholics Anonymous.   (A.R. 300)   He noted that Buyes's tendency
20 to isolate from people was not helping his depression.   He diag-
21 nosed Buyes with Major Depressive Disorder, single episode,
22 moderate; Cognitive Disorder NOS, provisional; Alcohol Dependence,
23 early full remission, by history; and Dysthymic Disorder.   He
24 estimated Buyes's current GAF at 50-55.[3]  (*Id.*)

25     Buyes saw Dr. Reynolds on November 14, 2006, for followup.
26 His urinary tract infection had resolved.  He complained of pain in

27

28     [3]*See* note 2, *supra*.

15 - FINDINGS & RECOMMENDATION

1  his left wrist, and was diagnosed with carpal tunnel syndrome.
2  Various lab tests were ordered.  (A.R. 379)  Buyes returned for
3  followup on December 1, 2006.  He reported that his last drink of
4  alcohol was two days earlier, and he had attended an Alcoholics
5  Anonymous meeting the previous evening.  He wanted to try Antabuse,
6  which the doctor prescribed for him.  Buyes failed to appear for a
7  scheduled medication check with Dr. Reynolds on December 7, 2006.
8  (A.R. 378)

9       On January 12, 2007[4], Buyes underwent an annual behavioral
10  health assessment by Dr. Hoch and counselor Neben.  (A.R. 554-58)
11  The interview was conducted by phone because Buyes was in a
12  residential treatment program for alcohol abuse.  Notes indicate
13  "[h]is tenure in residential treatment has been rocky."  (A.R. 554)
14  Buyes had stayed in treatment longer than most people, and had
15  become irritable and depressed.  On one occasion, he had burned his
16  hand when he felt depressed or angry.  He was taking Paxil,
17  Trazodone, and Abilify, on a regular basis.  Buyes was noted to
18  have average intellect, and impaired judgment.  He described his
19  employment history during the past year, stating he had worked at
20  a gas station, done some miscellaneous construction work with a
21  friend, and some other miscellaneous jobs.  In the past, he had
22  worked "in shipping and receiving, fixing machinery in the field,
23  welding, truck driving, forklift driving, framing and cement work."
24  (A.R. 565)  All of his past jobs had been "impacted negatively by

25

26       [4]The date of this assessment is confusing.  On the first page,
   it indicates the assessment was performed on "01/03/2007" (A.R.
27  554), and the treatment plan is dated "1/3/07" (A.R. 559).
   However, both counselor Neben and Dr. Hoch signed the assessment on
28  "6-12-07."  (A.R. 558)

16 - FINDINGS & RECOMMENDATION

1 alcohol abuse." (*Id.*)  He also stated his relationships and legal
2 problems had been exacerbated by anger issues and alcohol abuse.
3 (A.R. 556)  Buyes stated he "is a hard worker when he can work,"
4 but his physical pain, especially in his back and due to bursitis,
5 limited the amount of work he could do.  (A.R. 557)

6     Notes indicate Buyes used alcohol when he became depressed,
7 and his depression in the past was deemed severe.  His alcohol use
8 made his depression worse when he stopped drinking.  He had had
9 instances of anger problems, and frequently was irritable and
10 depressed.  He was diagnosed with PTSD; Major Depressive Disorder;
11 and Alcohol Dependence in early remission. (*Id.*)  His current GAF
12 was estimated at 55.[5]  (A.R. 558)  His treatment plan included
13 regular individual therapy and medication management.  (A.R. 559)

14     Buyes saw a physician's assistant at VGMHC on April 19, 2007,
15 for complaints of back pain.  Buyes had been discharged recently
16 from three-and-a-half months in alcoholism treatment.  He com-
17 plained of muscle and joint pain in his shoulders, hips, and knees
18 for the past two months, and joint popping in his shoulders.  His
19 pain increased with exercise, and his lower back felt stiff and
20 tight after sitting.  He also complained of ringing in his ears,
21 black spots/tunnel vision, feeling off balance, and problems
22 concentrating.  He had started smoking recently, and had a cough,
23 wheezing, and chest tightness.  He requested a prescription for
24 Antabuse, stating he had been sober for four-and-a-half months.  He
25 was given an albuterol inhaler, which helped his breathing.
26 Antabuse was prescribed.  For his multiple myalgias, he was advised

27

28     [5]*See* note 2, *supra*.

17 - FINDINGS & RECOMMENDATION

1  to use ice/heat, stretch, and take Ibuprofen as needed.  He was
2  referred to the Yamhill County Public Health Department for
3  followup. (A.R. 377)

4     Buyes saw the physician's assistant for followup on May 3,
5  2007.  He continued to complain of chronic myalgias, worse in the
6  morning.  All of his lab tests were within normal limits, and there
7  was no evidence of rheumatic problems.  The P.A. noted that
8  myalgias were one possible side effect of Trazodone, a medication
9  Buyes had been taking for some time.  The Trazodone was
10 discontinued.  Buyes was advised to follow up with a psychiatrist
11 to start an alternative medication.  (A.R. 376)

12    Buyes saw Dr. Reynolds on May 15, 2007, for followup of back
13 pain and muscle pain.  Buyes stated he was "still having terrible
14 myalgias," which had been ongoing for two-and-a-half months.  (A.R.
15 375)  He had been sober for six months, and was not taking
16 Antabuse.  His pain symptoms had started while he was in rehab for
17 alcoholism.  He had discontinued Trazodone, with no change in his
18 symptoms.  Buyes exhibited pain upon palpation and with movement of
19 his right shoulder, and upper trapezius and quadriceps muscles.
20 The doctor prescribed Feldene, and pool therapy.  (A.R. 375)

21    On May 22, 2007, Buyes saw another doctor at VGMHC,
22 complaining that Feldene was not relieving his multiple myalgias
23 and arthralgias.  He was continued on Feldene, and Flexeril was
24 added to his medications. He also was taking Trazodone, Albuterol,
25 Antabuse, Paxil, and Abilify.  (A.R. 374)

26    On May 29, 2007, Buyes went to the emergency room complaining
27 of generalized malaise, muscle pain, and chronic back pain.  He
28 stated his shoulder pain was preventing him from raising his arms.

18 - FINDINGS & RECOMMENDATION

He rated his upper extremity pain as 7-8 on a ten-point scale. He also had a cough, but chest x-rays were normal. He was given a prescription for Ultram for his pain, but no treatment for his cough. (A.R. 310-15)

Buyes saw Dr. Reynolds on June 12, 2007, complaining of back pain and right arm pain, as well as a "wheezy cough." (A.R. 373) Buyes continued to maintain his sobriety. An x-ray of his right shoulder was ordered. He also was diagnosed with a viral urinary tract infection. Notes indicate he was taking Paxil, Flexeril, Albuterol, Amitriptyline, and Abilify. He was directed to return in two days for followup. (*Id.*)

Buyes saw Dr. Reynolds for followup on June 14, 2007, in connection with his complaints of ongoing shoulder pain. Buyes stated Vicodin was not helping his pain much. His right shoulder x-ray showed a "prominent spur along the inferior aspect of the right acromion." (A.R. 372, 407-08) Buyes returned to see the doctor on June 22, 2007, for followup of "fibromyalgia." (A.R. 371) The doctor had requested that Buyes come in to review "abnormal labs." (*Id.*) Buyes continued to complain of myalgias. Blood was drawn for further lab tests. (*Id.*)

Buyes saw Dr. Reynolds on June 29, 2007, for complaints of proximal shoulder and hip pain and weakness. He was referred for an EMG. (A.R. 430)

Buyes saw Dr. Reynolds on July 5, 2007, for followup of ongoing shoulder pain. Buyes stated he had "been doing some work carrying material" weighing twenty to twenty-five pounds. (A.R. 429) Percocet was prescribed, with a further diagnosis awaiting the results of an EMG. (*Id.*)

19 - FINDINGS & RECOMMENDATION

Buyes received a refill of Percocet on July 13, 2007, for "myalgias" and subjective complaints of weakness.  (A.R. 368)

On July 31, 2007, Buyes was seen in the emergency room for a complaint of left shoulder pain that was preventing him from raising his left arm/shoulder.  He reported intermittent muscular pain since February 2007, radiating between his upper arms and hips, and noted he was scheduled for an EMG a few days later to rule out fibromyalgia.  He had been taking oxycodone 5 mg every four hours, and had run out of his medication.  His doctor was out of the office, and he was requesting pain medication.  He listed his current medications, other than the oxycodone, as Amitriptyline Hydrochloride, Paxil, Glucosamine Hydrochloride, and Abilify (which he indicated he could not afford).  (A.R. 304)  He was given enough oxycodone to last until his doctor's appointment later in the week.  (A.R. 302-07)

On August 3, 2007, Buyes saw a doctor at VGMHC for followup after an EMG the previous day. The doctor did not yet have the report.  Buyes stated "everything was normal except for a little 'carpal tunnel syndrome' on [the right]."  (A.R. 367)  Buyes requested a refill of his pain medications "as his myalgias continue[d] unabated."  (*Id.*)  The doctor refilled a prescription for Percocet, and suggested that referral to a rheumatologist might be in order.  (*Id.*)

On August 9, 2007, Buyes saw a different doctor at VGMHC for complaints of ongoing pain in both shoulders and hips.  An EMG indicated mild carpal tunnel syndrome on the right.  X-rays of his left shoulder showed minimal spurring, but no other abnormality,

20 - FINDINGS & RECOMMENDATION

and his examination otherwise was normal.  The doctor recommended referral to a rheumatologist.  (A.R. 366, 406)

Buyes saw Dr. Reynolds on August 23, 2007, for followup of his ongoing pain complaints.  An EMG was negative for myopathy or neuropathy, and hip x-rays were normal.  Buyes was diagnosed with fibromyalgia.  Percocet was discontinued, and warm water exercises were prescribed.  He also was given a prescription for Feldene. (A.R. 424)

Buyes was seen in the E.R. on August 28, 2007, for complaints of head and body aches.  X-rays of his lungs appeared clear.  His heart was noted to be "borderline, probably upper normal in size," but there was "no evidence of active disease in the chest."  (A.R. 357-59, 404-05)  He was treated with an injection of Toradol, two shots of morphine, and a prescription for Vicodin.  The next day, Buyes saw Dr. Reynolds for followup.  He was diagnosed with fibromyalgia, and notes indicate he would be referred to a rheuma-tologist for further evaluation.  (A.R. 363, 423; *see* A.R. 388-92)

Buyes returned to the E.R. on August 30, 2007, complaining of severe, aching back pain for several days, with no radiation into his extremities.  Buyes stated he had injured himself when he "rolled [an] atv backwards over onto himself," with no indication of when this occurred.  (A.R. 343)  X-rays showed a compression fracture at T12, that was suspected to be an old fracture by history and exam.  He was diagnosed with a "thoracic spine compres-sion fracture and lumbar contusion."  (A.R. 344)  X-rays of Buyes's cervical and lumbar spine also showed multi-level degenerative changes with disk space narrowing and some osteophyte spurring, as well as an anterior wedge compression deformity at L1 that was

21 - FINDINGS & RECOMMENDATION

thought to be chronic in nature, with no significant change from a CT exam on July 2, 2004.  Buyes was given prescriptions for Flexeril and Percocet, and was discharged "in good condition." (*Id.; see* A.R. 345-56)  As Buyes was leaving, he told the doctor that "he was just going to start drinking alcohol again to relieve pain." (A.R. 364)

On September 4, 2007, Buyes was seen in the emergency room for an exacerbation of chronic low back pain due to moving furniture, and painting while on a ladder.  (A.R. 474-82)  He was given prescriptions for Flexeril and Percocet, and was advised to start back exercises daily once his acute exacerbation had resolved. (A.R. 479, 481)

Buyes saw family practitioner John F. Gilligan, M.D. on September 5, 2007, for followup of his emergency room visit.  Buyes reported constant back pain; radicular arm pain triggered by neck movement; muscle aches in his neck and shoulder; and neurological symptoms.  He was diagnosed with cervical and lumbar disc degeneration.  The doctor prescribed Oxycodone with Acetaminophen for pain, a muscle relaxant, and a short course of steroids.  (A.R. 441-42)

When Buyes returned to see Dr. Reynolds on September 18, 2007, he reported that he had "never started drinking again," despite his statement to the ER doctor on August 30, 2007.  (A.R. 421; *see* A.R. 364)  Buyes consented to a trial of Lyrica, and requested a referral to a rheumatologist.  Dr. Reynolds diagnosed Buyes with fibromyalgia, and referred him back to Dr. Gilligan for further evaluation.  (*Id.*)

22 - FINDINGS & RECOMMENDATION

Dr. Gilligan saw Buyes on September 28, 2007, for followup of his lumbar disc degeneration. The doctor was awaiting approval for MRI studies from Buyes's insurance carrier. He prescribed Percocet and Flexeril. (A.R. 339-40)

Buyes missed a scheduled appointment for an intake evaluation with Licensed Professional Counselor Betty Foufos on October 1, 2007. (A.R. 525) He missed another appointment on October 22, 2007, and Foufos noted Buyes had "failed all appointments since intended transfer from Bruce Neben, PsyD, LPC." (A.R. 524) Buyes had not responded to outreach efforts, and Foufos suggested Buyes meet with a therapist at the time of his next medication management appointment with Dr. Hoch. (A.R. 523, 524)

Buyes saw Dr. Reynolds on October 29, 2007, for followup of his complaints of ongoing proximal hip and shoulder pain and weakness. Notes indicate he was taking Oxycodone 5 mg. four times daily and Glucosamine for his shoulder and hip pain, as well as Paxil for depression. His strength was 5/5 in both the upper and lower extremities, and all of his laboratory test results were normal. He was referred for an EMG. (A.R. 370)

On October 30, 2007, Physical Medicine and Rehabilitation Specialist Martin Kehrli, M.D. reviewed the Record and completed a Physical Residual Functional Capacity ("RFC") Assessment form. (A.R. 444-51) He opined Buyes would be able to lift ten pounds frequently and twenty pounds occasionally; stand/walk and sit for about six hours, each, in an eight-hour workday with normal breaks; and push/pull without limitation. He opined Buyes would be able to perform balancing frequently, and perform all other types of

23 - FINDINGS & RECOMMENDATION

postural activities occasionally. He found Buyes would have no other limitations of his physical functional abilities. (*Id.*)

Buyes missed a scheduled appointment with Dr. Hoch on October 31, 2007. (A.R. 526)

On October 31, 2007, psychologist Paul Rethinger, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 452-65), and a Mental RFC Assessment form (A.R. 466-69). He evaluated Buyes under Listings 12.04, Major Depressive Disorder; 12.06, Post-Traumatic Stress Disorder (PTSD); and 12.09, Alcohol Abuse, in remission. (A.R. 452-60) He found that these disorders would cause mild limitation in Buyes's activities of daily living, and his ability to maintain concentration, persistence, or pace; and moderate limitation in his social functioning. (A.R. 462) Dr. Rethinger opined Buyes's mental impairments would cause moderate limitations in his ability to interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. (A.R. 466-67) He opined Buyes's mental impairments would not cause any other significant limitations in his mental work-related abilities. (*Id.*) Dr. Rethinger recommended that Buyes avoid "frequent public contact due to anger issues," and any interaction with coworkers "should be brief and structured." (A.R. 468) He further recommended Buyes avoid hazards due to his history of alcoholism, and he suggested Buyes "would benefit from help setting independent goals[.]" (*Id.*)

24 - FINDINGS & RECOMMENDATION

On November 8, 2007, Buyes saw neurosurgeon Francisco X. Soldevilla, M.D. for consultation regarding ongoing complaints of low back and left leg pain. (A.R. 513-14)  The doctor recommended Buyes undergo "a lateral recess decompression from L2 to L5 some time in the near future." (A.R. 514)

Buyes was seen in the emergency room on November 12, 2007, for complaints of pain in his right shoulder, right hand, and low back. (A.R. 483-93)  Buyes had injured himself when he fell from "a rock" onto his right side. (A.R. 486; *see* A.R. 484)  He was diagnosed with a lumbar strain, right hand and wrist contusion, and right shoulder separation. (A.R. 485)  Notes indicate he was scheduled for back surgery on December 4, 2007. (A.R. 486)  X-rays of his low back, and right hand, wrist, and shoulder, showed spondylosis in his lumbar spine; "[s]evere disk narrowing at L5-S1 eccentric posteriorly"; "[d]egenerative and hypertrophic changes in the L4-5 and L5-S1 facet joints of a moderate degree"; and minimal osteophytes in his right thumb; but no fractures. (A.R. 490-91) He was treated with I.V. Phenergan and morphine; his right arm was placed in a sling; and his right hand was placed in a preformed hard splint. (A.R. 487)

Buyes saw Dr. Hoch on November 13, 2007, for medication management.  Buyes reported that he had "been struggling," dealing with pain problems and feeling depressed.  He appeared to be "uncomfortable sitting." (A.R. 527)  Buyes was remaining sober, and stated his worst day sober was better than his best day drunk. He had occasional nightmares and sometimes heard voices.  He had run out of Paxil about a month earlier.  The medication was restarted, but at a lower dose.  He had missed several scheduled

25 - FINDINGS & RECOMMENDATION

appointments for an intake evaluation with counselor Foufos, and he was advised that if he missed another appointment, he would be dropped from the program. (A.R. 527-28)

The same day (November 13, 2007), Buyes saw counselor Foufos for a Mental Status evaluation. Buyes described his mental health history, and a 100-day residential treatment he had undergone for alcoholism in early 2007. He stated he relied on his girlfriend to assist him with cooking, cleaning, transportation, and bathing, due to limitations he attributed to his ongoing pain. He stated he is not well organized, and he requires assistance managing money. He stated he went out to A.A. meetings, but he experienced panic in public places, and he tended to isolate himself. He complained of difficulty concentrating; forgetfulness; frustration with tasks that require attention, such as filling out forms; and problems with anger. Foufos noted Buyes exhibited some indicators of Attention Deficit Disorder. She diagnosed Buyes with Major Depressive Disorder (provisional), PTSD (provisional), and Alcohol Dependence, reportedly in full remission since September 14, 2006. (A.R. 518-20)

On December 4, 2007, Buyes was hospitalized and underwent a "[l]eft lateral recess decompression of L2 through L5," to address his ongoing low back and left leg pain. (A.R. 494; *see* A.R. 494-510) A pre-operative MRI had shown "significant lateral recess stenosis on the left from L2 to L5." (A.R. 494) He was discharged on December 6, 2007, with prescriptions for Oxycodone 5 mg., one to two tablets every four to six hours as needed for pain; and Valium 5 mg., one to two tablets every six to eight hours as needed for muscle spasms. (*Id.*)

26 - FINDINGS & RECOMMENDATION

1    Buyes saw counselor Foufos on December 18, 2007, for
2  individual therapy.  Buyes exhibited "some indicators of ADD:
3  interruptions; blurting; gets side-tracked in matters that require
4  his focus; and impulse control problems."  (A.R. 522)

5    Buyes saw Dr. Soldevilla for followup on January 2, 2008.  His
6  incision was noted to be well healed.  Buyes still had "some back
7  and buttock pain, but it [was] better than it was preop."  (A.R.
8  512)  He was directed to go to physical therapy "in the near
9  future."  (*Id.*)

10    On January 7, 2008, Buyes saw Michael Van Allen, M.D., an
11  orthopedic surgeon specializing in hand surgery, for consultation
12  regarding pain in his hands.  He was diagnosed with bilateral
13  carpal tunnel syndrome.  The doctor recommended updated nerve
14  studies, with a view toward possible surgery in the future.  (A.R.
15  516-17)

16    Buyes saw counselor Foufos again on January 17, 2008, for
17  individual therapy.  Notes indicate Buyes had been sober for
18  thirteen months.  He continued to exhibit signs of possible ADD,
19  including frequent interruptions, fidgeting, and easily going
20  "astray in conversation."  (A.R. 521)  Buyes stated he had "trouble
21  completing small tasks (paperwork that requires attention)," and he
22  described a "history of problems with impulse control."  (*Id.*)  He
23  complained of sleep difficulties, "rheumatoid arthritis," and back
24  problems, and "some depressed mood associated with pains."  (*Id.*)

25    On March 11, 2008, clinical psychologist Dorothy Anderson,
26  Ph.D. reviewed the record on connection with Buyes's request for
27  reconsideration.  She noted that the physical and mental RFC
28  assessments completed at the time Buyes first applied for benefits

27 - FINDINGS & RECOMMENDATION

suggested "limitations only in working with the general public and coworkers." (A.R. 561) Dr. Anderson reviewed the new evidence submitted since the initial denial, and found that because most of Buyes's "issues are from anger and dealing with people," the initial recommendations appeared to be reasonable. (*Id.*)

On March 11, 2008, Buyes was seen in the emergency room after he nearly fainted following a coughing spell. He nearly blacked out, and fell to the ground, injuring his left wrist when he fell. He complained of severe pain in his wrist. X-rays did not show any fracture or abnormality. Buyes was placed on a cardiac monitor, and was treated with an IV, oxygen, and oral ibuprofen. His wrist was placed in a Velcro splint. (A.R. 565-65) His discharge diagnoses were "Vasovagal reaction induced by coughing paroxysm," and "Left wrist strain." (A.R. 566)

On March 12, 2008, Martin B. Lahr, M.D., a pediatrician, reviewed the Record on behalf of the Agency in connection with Buyes's request for reconsideration. Dr. Lahr reviewed new evidence showing Buyes has mild carpal tunnel syndrome on the right. However, he observed that an EMG showed the condition to be "only mild," and "inconsistencies noted with hand flexion suggest[] that allegations may be portrayed more severe than they are." (A.R. 567) He recommended affirming the prior decision denying Buyes's application for benefits. (*Id.*)

In late June and early July 2008, Buyes was treated in the hospital for a rectal fissure or tear caused by insertion of a large glass cologne bottle. The bottle was removed surgically, and the rectal fissure/tear was repaired. Buyes also had problems

1 urinating.  He wore a urinary catheter for several days, and was
2 treated with medications.  (A.R. 592-613, 624, 655)

3      On July 22, 2008, Buyes saw internist Sean M. Stadtlander,
4 M.D. for followup of his chronic back pain, fibromyalgia, prostate
5 problems, and possible sleep apnea "with nocturnal leg movements."
6 Buyes was referred for a sleep study.  He also was referred to a
7 psychiatrist for his mental health issues.  (A.R. 653-54)

8      Buyes saw Dr. Stadtlander on August 15, 2008, for followup of
9 his chronic back pain, fibromyalgia, and "multiple issues."  (A.R.
10 652)  Notes indicate Buyes had "underlying psychiatric issues," but
11 he was unable to see a psychiatrist (reason unspecified).  However,
12 he was noted to be "fairly stable" at this time.  The doctor
13 started Buyes on a very low dose of a long-acting morphine, and
14 directed Buyes to continue taking Neurontin.  (*Id.*)

15      On August 29, 2008, Buyes saw Dr. Stadtlander for followup of
16 his chronic back pain and fibromyalgia.  He was doing "somewhat
17 better now" on morphine, but he was having problems with insomnia.
18 The doctor noted Buyes's fibromyalgia and back pain appeared to be
19 "slowly approaching control on his current regimen[.]"  (A.R. 651)

20      Buyes saw internist Evagelia Baros, D.O. on September 24,
21 2008, complaining of pain after falling off a ladder the previous
22 day.  Buyes stated he had been "on a ladder painting his mother[']s
23 home and accidentally fell off."  (A.R. 649)  He rode his bicycle
24 home, and thought he was doing fine, but once he got home he was
25 unable to stand erect due to lower back pain.  The doctor suspected
26 a strain or sprain.  She advised Buyes to continue with his normal
27 activities as he was able, with no strenuous activity; apply heat
28 to the sore area; and take oxycodone as needed for pain.  (A.R.

29 - FINDINGS & RECOMMENDATION

649-50)  Notes indicate Buyes was 71" tall and weighed 199.6 pounds as of this appointment.  (A.R. 650)

On September 26, 2008, Buyes saw Dr. Stadtlander for followup of "chronic back pain with acute exacerbation due to falling off of a ladder[.]"  (A.R. 648)  Buyes had been on morphine for his back pain, and the doctor recommended he stay on the morphine and add some Percocet for breakthrough pain, and Flexeril for muscle spasms.  (*Id.*)

On October 30, 2008, Buyes underwent a sleep study in connection with "[]possible obstructive sleep apnea."  (A.R. 588)  He was diagnosed with "[p]rimary snoring," but no sleep apnea was present.  (A.R. 589; *see* A.R. 588-91)

Buyes saw Dr. Stadtlander on November 14, 2008, for followup of his chronic back pain, fibromyalgia, and depression.  Buyes reported that his depression was not doing well.  His energy level was low, and he felt fatigued.  His back pain was reasonably well controlled on his current medications.  The doctor opined Buyes's low energy level was due to his depression, and he prescribed a trial of Effexor XR.  Buyes's current medications were listed as Effexor XR 150 mg. at bedtime (for depression); Ibuprofen 800 mg three times daily (for pain); Neurontin 600 mg. tabs, four times daily (for fibromyalgia pain); Morphine sulfate CR 100 mg., twice daily (for back pain); Oxycodone HCL 5 mg., up to four times daily as needed for pain; Flexeril 10 mg. (a muscle relaxant), three times daily as needed; and Ambien 10 mg. at bedtime (for insomnia).  (A.R. 646-47)

Buyes saw Dr. Stadtlander on January 5, 2009, for followup of his fibromyalgia, prostate problems, and insomnia.  His back pain

30 - FINDINGS & RECOMMENDATION

was reasonably well controlled on his current medications, which were noted to be: Viagra, as needed for erectile dysfunction; doxazosin mesylate (used to treat high blood pressure); Neurontin 800 mg tabs, one tablet four times daily (for fibromyalgia pain); Ambien, for insomnia; and Effexor, for depression.  (A.R. 644-45)

In February 2009, Buyes was seen in the emergency room and treated for a urinary tract infection.  (A.R. 577-87)  In April 2009, he was seen in the emergency room and treated for a rectal tear.  (A.R. 573-76)

On March 30, 2009, Buyes saw Dr. Stadtlander, stating he wanted to wean himself off narcotic pain medications.  His "chronic back pain and fibromyalgia" were reasonably well controlled on his current medications, but he wanted to discuss non-narcotic options. Although the doctor agreed it would be reasonable for Buyes to try to get off the narcotics, he did not believe it would be "terribly easy," because Buyes already was on very low doses of his medica- tions.  He planned to refer Buyes to a pain clinic for a suggested regimen to wean him off the narcotics. (A.R. 640)

By the time Buyes saw Dr. Stadtlander for followup on April 13, 2009, he had successfully weaned himself off narcotics. He reportedly had gone through some withdrawal symptoms, but he was doing well.  (A.R. 642)

Buyes was admitted into the hospital on May 1, 2009, for retrieval of a foreign body from his rectum, and repair of a urethral glans injury.  Buyes apparently had restarted narcotic pain medications, because Oxycodone was listed as one of his current medications.  (A.R. 627)  The doctor's notes indicate the following:

31 - FINDINGS & RECOMMENDATION

> [Buyes] is a 53-year-old male who came in with
> an incision that was induced and I thought
> initially this was self-induced but he paid
> someone to use mutilating-type techniques by
> girlfriend cutting him with a knife on his
> back and abdomen and then went ahead and cut
> the urethra down with scissors.  There was
> some bleeding but was controlled when he came
> to the emergency room.  He had had a previous
> glans piercing to the urethra called a Prince
> Albert.  He removed this a few months ago and
> had a fistula through the area. . . .  [O]n
> admission . . . [h]e seemed to be relatively
> comfortable.   The glans was cut from the
> meatus down to the corona sulcus with scarring
> over cutaneous surface to the area of the
> fistula, which is at the most proximal portion
> of the incision.   There were a number of
> abrasions across the abdomen, thigh, . . .
> buttocks and back.

(*Id.*)  A foreign body was removed from Buyes's rectum under anesthesia[6], and his penile injury was repaired.  He was directed to wear a Foley catheter for ten days, and antibiotics were prescribed.  In addition, the treating physician noted, "I am going to talk to Dr. Stadtlander regarding obviously some type of psychological counseling, that I think he obviously does really need[]."  (A.R. 628)  Buyes was discharged from the hospital on May 3, 2009.  (*See* A.R. 627-39; 659-63)

Buyes saw Dr. Stadtlander on May 11, 2009, for followup of his hospitalization, and his fibromyalgia and chronic back pain.  Buyes stated his back pain was "still a significant issue for him," although he was "doing reasonably well with his current regimen." (A.R. 641)  He was about to begin seeing a psychologist for his

---

[6]The consulting surgeon's notes indicate this was the third such incident in thirteen months.  In addition to the glass bottle noted previously, Buyes also had a flashlight removed from his rectum in March 2008.  (A.R. 624, 635)

32 - FINDINGS & RECOMMENDATION

mental health issues.  Dr. Stadtlander increased Buyes's dosage of
Neurontin, and continued his other medications without change.
(*Id.*)

Buyes saw Dr. Stadtlander for followup on August 10, 2009.  He
complained of "two months of back pain going down to his right leg
all the way to the foot with a sharp pain in his back that is
significantly bother[some] to him[.]"  (A.R. 666)  Buyes also
stated his fibromyalgia was not well controlled with Neurontin.  He
stated his pain medications only masked the pain, and he was still
limited significantly in his activity.  He also was concerned about
the significant amounts of narcotics he was taking, and he reported
"some issues with his antidepressants."  (*Id.*)  Buyes exhibited
positive straight-leg-raising on the right.  He was referred to a
psychiatrist regarding his depression, and physical therapy for
further evaluation.  (*Id.*)

On August 13, 2009, Buyes underwent a Behavioral Health
Assessment by a social worker at Yamhill County Mental Health.
(A.R. 678-83)  Buyes stated his medications had become less
effective, and he had recent stressors including the deaths of two
close friends, and the ending of a long-term relationship.  He
attended regular A.A. meetings, and was remaining sober.  After
conducting a thorough interview, the social worker diagnosed Buyes
with "Chronic PTSD"; "Major Depressive Disorder, Provisional"; and
"Alcohol Dependence, Sustained full Remission." (A.R. 682)

On September 16, 2009, Buyes saw psychiatrist Utako Sekiya,
M.D. for an intake evaluation through the Yamhill County Adult
Mental Health Program.  (A.R. 674-77)  Buyes's chief complaints
were a worsening of his depression over the previous six months,

33 - FINDINGS & RECOMMENDATION

and increasingly self-injurious behaviors.  The doctor noted Buyes had a depressed mood, and a "sad and anxious affect."  (A.R. 675) He exhibited "discontinued concentration and attention"; somewhat impaired memory, "with difficulty recalling recent events"; average intelligence; and "fair" insight and judgment.  (A.R. 676)  Buyes stated his appetite had decreased and he had lost twenty pounds. The doctor noted Buyes's use of pain medications for his chronic back pain was "considered as a main factor of worsening his depression as well as persisting challenging living situation with financial and housing problems."  (*Id.*)  He noted Buyes needed "consistent counseling to develop good coping skills" to address his worsening self-injurious behaviors.  (*Id.*)  Dr. Sekiya estimated Buyes's current GAF at 50.[7]  He started Buyes on a low dose of Paxil, and recommended Buyes receive regular counseling. In addition, Buyes had relapsed on alcohol the previous month, and the doctor suggested he might benefit from a treatment program. (A.R. 677)

On October 14, 2009, Buyes saw Dr. Sekiya for followup of his Major Depressive Disorder.  Buyes had not noticed any remarkable change on the Paxil, except he felt somewhat less moody and emotional.  He was sleeping four to five hours at night, and his appetite was stable.  Notes indicate Buyes had been sober for thirty months prior to his recent relapse.  He was smoking a pack

---

[7]A GAF level of 50 indicates "'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *McFarland v. Astrue*, 288 Fed. Appx. 357,l 369 (9th Cir. 2008) (quoting Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th ed. 2000)).

34 - FINDINGS & RECOMMENDATION

of cigarettes a day, and was interested in joining a group to stop smoking.  The doctor increased Buyes's Paxil dosage, and started him on Trazodone for insomnia.  (A.R. 670-71)

Buyes saw a counselor for individual therapy on October 29, 2009, and again on November 5, 2009.  He was "noticeably less depressed," and was doing well with his support group.  (A.R. 722) He saw his counselor again on November 12, 2009.  Buyes had "stopped his self critical thinking," and was coping better.  (A.R. 721)

Dr. Sekiya saw Buyes for followup on November 13, 2009.  Buyes reported an improvement in his mood on the increased Paxil dosage. He had more energy and found it easier to do things in the morning hours, although he felt somewhat over-sedated in the morning from the trazodone.  He continued to have severe back pain, and was completing paperwork to obtain a neurosurgical consultation.  He was still taking oxycodone 20 mg a day, and morphine sulfate 100 mg a day.  He was experiencing sexual side effects from his medications, and requested a change in his antidepressant.  The doctor discontinued the Paxil and prescribed Cymbalta.  Buyes was advised to take his trazodone earlier in the evening to prevent morning over-sedation.  He was advised to consult with his primary care provider regarding any change in his pain medications.  (A.R. 696)

Buyes saw his counselor on December 3, 2009.  Buyes was noted to be "doing better than baseline."  (A.R. 718)  His next session was scheduled for December 10, 2009, but Buyes called and left a message canceling the appointment, and indicating he would call back to reschedule.  (A.R. 717)

35 - FINDINGS & RECOMMENDATION

1    Buyes saw Dr. Sekiya for followup on December 14, 2009.  Buyes
2  reported fewer sexual side effects on the Cymbalta than he had
3  experienced on Paxil.  He described recent changes in his mood,
4  where he would have two or three days feeling extraordinarily
5  happy, followed by three to four days feeling depressed, grumpy,
6  and sad, with suicidal thoughts.  He sometimes would have a few
7  days when he felt "right in the middle," as well.  (A.R. 715)  He
8  was staying sober, but was still smoking one-and-a-half packs of
9  cigarettes a day.  Dr. Sekiya continued Buyes on Cymbalta and
10  trazodone, and added Depakote.  (*Id.*)

11    On December 23, 2009, Dr. Sekiya completed a medical source
12  statement form supplied by Buyes's attorney.  The doctor listed
13  Buyes's Axis I diagnosis as "296.32" (i.e., Major Depressive
14  Disorder, Recurrent); and his current GAF at 50.[8]  (A.R. 684)
15  According to Dr. Sekiya, Buyes's symptoms associated with his
16  depression included anhedonia, appetite disturbance with weight
17  change, decreased energy, mood disturbance, difficulty thinking or
18  concentrating, psychomotor agitation, persistent disturbances of
19  mood or affect, substance dependence, history of bipolar syndrome,
20  sleep disturbance, and inflated self-esteem.  (A.R. 685)  The
21  doctor noted Buyes "presents with depressive features including
22  moderate social withdrawal, lack of energy, mild anhedonia and
23  unstable sleep."  (A.R. 686)  He indicated Buyes was not a
24  malingerer.  (*Id.*)  He noted Buyes was being treated with Cymbalta
25  and Trazodone, which caused decreased libido and sexual
26
27  _____

28    [8]*Id.*

36 - FINDINGS & RECOMMENDATION

1  dysfunction.   (A.R. 686-87)   He indicated Buyes's prognosis was
2  "fair."  (A.R. 687)

3      Dr. Sekiya further indicated Buyes's impairment had not lasted
4  twelve months, and could not be expected to last twelve months or
5  more.  He opined Buyes's condition would not tend to degenerate or
6  deteriorate over time, and Buyes would not experience any
7  substantial difficulty with stamina, pain, or fatigue if he worked
8  full-time at a light or sedentary job.  However, he indicated
9  Buyes would need to work at a reduced pace; at a regular pace, his
10 ability to sustain full-time work would be poor.  (*Id.*)  The doctor
11 further indicated Buyes's health problems likely would be made
12 worse by sustained full-time work at the light or sedentary level
13 of exertion.  (*Id.*)  Dr. Sekiya opined Buyes would have significant
14 problems getting along with members of the public, supervisors, and
15 co-workers.  In addition, he indicated Buyes's "depression may well
16 exacerbate his condition of chronic back pain."  (A.R. 688)

17     The doctor opined Buyes's impairments or treatment would cause
18 him to be absent from work more than four times a month.  (*Id.*)  He
19 opined Buyes would have moderate limitations in his ability to
20 complete a normal workday and work week without interruptions from
21 psychologically-based symptoms; to perform at a consistent pace
22 without an unreasonable number and length of rest periods; to get
23 along with co-workers or peers without distracting them unduly or
24 exhibiting behavioral extremes; to respond appropriately to changes
25 in a routine work setting; and to deal with normal work stress.  He
26 opined Buyes would be mildly limited in his ability to remember
27 work-like procedures; maintain attention for two-hour segments; and
28 maintain regular attendance and punctuality.  He indicated Buyes

37 - FINDINGS & RECOMMENDATION

1  would be slightly limited in his ability to understand, remember,
2  and carry out very short and simple instructions; sustain an
3  ordinary routine without special supervision; work in coordination
4  with or proximity to others without being unduly distracted; make
5  simple work-related decisions; ask simple questions or request
6  assistance; accept instructions and respond appropriately to
7  supervisors' criticism; and be aware of normal hazards and take
8  appropriate precautions. (A.R. 689-90) As justification for these
9  opinions, the doctor noted, "Mr. Buyes, as of 11/13/09 states he's
10 still recovering from depressive state with backache.  He has
11 history of poor anger control."  (A.R. 690)

12     Dr. Sekiya opined Buyes's mental impairments would cause a
13 moderate limitation in his ability to maintain social functioning;
14 and "often" would result in deficiencies of concentration,
15 persistence, or pace, resulting in a failure to complete tasks in
16 a timely manner. (*Id.*) He indicated Buyes had been unable to work
17 continuously "since 1999." (*Id.*)  He further indicated Buyes had
18 had three episodes of decompensation within a twelve-month period,
19 each two weeks in duration. (A.R. 691) He opined that Buyes's use
20 of alcohol was to self-medicate his underlying mental or emotional
21 problem. (*Id.*)  The doctor further indicated if Buyes worked at a
22 full-time job, it is likely the stresses and expectations of work
23 would cause his GAF rating to decline. (*Id.*)

24     On January 17, 2010, Buyes was seen in the emergency room for
25 problems urinating and blood in his urine.  He was concerned
26 because he had passed a clot while straining to urinate.  He was
27 diagnosed with prostatitis. Buyes stated Dr. Stadtlander's office
28 had called in a prescription for an antibiotic that he had not

1  picked up yet, so he was not treated in the emergency room.  (A.R.
2  702-05)

3       Buyes saw Dr. Stadtlander on January 22, 2010, for followup
4  after his E.R. visit.  He was referred for a urology consultation
5  to rule out a bladder tumor.  Buyes continued to complain of
6  significant back pain, and he also was having "left arm pain from
7  his fibromyalgia."  (A.R. 712)

8       On February 1, 2010, Buyes saw Dr. Sekiya for followup.  Notes
9  indicate Buyes had been started on Depakote on December 14, 2009.
10 He reported less irritability and mood swings on the medication.
11 Buyes reportedly was "proud that he [had] been clean and sober for
12 2-1/2 years now."  (A.R. 713)  His Depakote dosage was increased,
13 and he continued to take Cymbalta and Trazodone, as well as his
14 pain medications.  (A.R. 713-14)

15      Buyes's treatment plan was reviewed by the Yamhill County
16 Adult Mental Health Program on August 13, 2010.  It was recommended
17 that he continue individual therapy for sixty to ninety minutes
18 weekly.  (A.R. 672-74)

19

20                    **B.  *Vocational Expert's Testimony***

21      After some clarification from Buyes regarding his duties and
22 the functional abilities required in his past work, the VE
23 described Buyes's work for the preceding fifteen years as follows[9]:

24

25      [9]In the VE's description of Buyes's past relevant work, he
   classifies jobs with an "SVP," or level of "specific vocational
26 preparation" required to perform certain jobs, according to the
   *Dictionary of Occupational Titles*.  The SVP "is defined as the
27 amount of lapsed time required by a typical worker to learn the
   techniques, acquire the information, and develop the facility
28                                          (continued...)

39 - FINDINGS & RECOMMENDATION

> SHIPPING AND RECEIVING CLERK, 222.387-050. Medium work per the DOT [i.e., the *Dictionary of Occupational Titles*], heavy work as described in the work history report. . . . SVP 5, skilled.  Second is SHIPPING AND RECEIVING SUPERVISOR, 222.137-030, light per the DOT, medium given his explanation of the job in, in response to [the ALJ's question]. SVP 6, skilled.  And then by testimony, there . . . was AUTOMOBILE SERVICE STATION ATTEN-DANT, 915.467-010, medium work per the DOT and light per the work history report. . . .; SVP 3 semi-skilled.  And then lastly – and I was not clear on this until his testimony, but it sounds like FRONT END LOADER OPERATOR, 921.683-042, medium work per the DOT, I'm not clear as to the physical demands as he per-formed it, SVP 3 semi-skilled.

(A.R. 74-75)

The ALJ noted Buyes had not earned sufficient income as a gas station attendant to include that in his past relevant work, but the other three jobs did qualify as past relevant work.  (A.R. 75) The ALJ asked the VE to consider a person of Buyes's age, and with his education and work background; i.e., "a person with a high-school age education, and a person with semi-skilled as well as skilled work history."  (A.R. 75-76)  The ALJ asked the VE to consider such a person with the following limitations:

> [L]et's assume a person who is capable of lifting 20 pounds occasionally, 10 pounds frequently; who is capable of standing and walking at least six hours out of an eight-hour workday, capable of sitting at least six hours out of an eight-hour workday; a person

_____

[9] (...continued)
needed for average performance in a specific job-worker situation."  *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled."  *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

40 - FINDINGS & RECOMMENDATION

who would be capable of frequent balancing,
but who on an occasional basis could climb
ramps and stairs, ladders and scaffolds; who
on an occasional basis could stoop, kneel,
crouch, and crawl; a person who, because of
limitations in social functioning, is limited
to occasional contact with the general public,
brief and structured contact with coworkers
. . . . A person [who] probably should avoid
hazards, because clearly as recently as . . .
this past fall, there's evidence that he was
drinking again.   Would a person with these
limitations be able to perform any of the
claimant's past relevant work, and again that
would be the shipping clerk, the shipping and
receiving supervisor position, and the front-
end loader position?

(A.R. 76)

The VE responded that the hypothetical individual could not return to any of Buyes's past relevant work, but he could perform other jobs that are present in significant numbers in the national economy.   (A.R. 76-77)   The VE gave examples of "office helper, . . . light work, SVP 2 unskilled"; "meter reader, . . . light work, SVP3 semi-skilled"; and "guard-security, . . . light work, SVP 3, semi-skilled."   (A.R. 78-79)   The VE noted he had reduced the numbers of available jobs "by about 50 percent . . ., to reflect the limitation about only occasional public contact and the portion of the hypothetical about standing and walking at least six – or apparently not too much more than six hours a day."   (A.R. 79)

The ALJ next asked the VE to assume the same limitations, but with added limitations that the individual would be unable to reach overhead with his left upper extremity; he would need the option to change positions; and he would be limited to no more than frequent handling and fingering with both hands.   The VE stated the additional limitations would not affect the individual's ability to perform the three listed jobs.   (A.R. 80)

41 - FINDINGS & RECOMMENDATION

1    Buyes's attorney asked the VE to consider the same individual
2  with limitations identified in the ALJ's second hypothetical, but
3  adding the need to work at a reduced pace equal to approximately
4  forty percent of normal.  The ALJ would not allow the question
5  unless counsel could define "normal."  (A.R. 81-82)

6    Buyes's counsel asked the VE to consider that the individual
7  would have "problems with stamina or fatigue," amounting to "about
8  a seven" on a ten-point scale, with "ten being a total failure."
9  (A.R. 82)  The individual also "would have substantial difficulty
10 getting along appropriately with members of the public, as well as
11 supervisors and coworkers they might encounter on the job," and
12 "would be expected to be absent from work more than four times a
13 month."  (*Id.*)  Further, the individual would be mildly limited,
14 meaning ten to nineteen percent of the time, in his "ability to
15 remember work-like procedures, maintain attention for two-hour
16 periods, and maintain regular attendance and be punctual within
17 customary and usually strict tolerances."  (*Id.*)  He would be
18 moderately limited, meaning twenty to twenty-nine percent of the
19 time, in "the ability to complete a normal workday and workweek
20 without interruptions from psychologically-based symptoms; to
21 perform at a consistent pace without an unreasonable number and
22 length of rest periods; to get along with coworkers or peers
23 without unduly distracting them or exhibiting behavioral extremes;
24 to respond appropriately to changes in a routine work setting; and
25 to deal with normal work stress."  (A.R. 83)

26    The VE indicated that a person's absence from work four times
27 a month on a regular basis is "significantly more than what would
28 be tolerated," and the person would be unable to maintain a job.

(A.R. 50-51)   If the person "had deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner," and these deficiencies occurred one-third of the time, the VE indicated the individual would be unable to maintain any type of employment.  (A.R. 84)

### C.  Buyes's Testimony

#### 1.  Buyes's hearing testimony

At the start of the hearing, the ALJ asked Buyes's attorney to identify all of the conditions Buyes claims to be severe, and upon which he bases his disability claim.  The attorney responded:

> Physical ones would be back and shoulders, something known as Osgood-Schlatter Disease, blood pressure, left ankle, fibromyalgia, headaches, irritable bowel, sleep disturbance, dizziness, bladder, history of a head injury, we have mental health issues, depression, anxiety, panic attacks, borderline personality disorder, problems with memory, attention, concentration.

(A.R. 37)

At the time of the hearing, Buyes was living in Newberg, Oregon, with his mother and stepfather.  He was helping take care of his elderly stepfather, who was "in the last stages of Parkinson's [disease]."  (A.R. 38)  Buyes is divorced, and has three grown daughters.  He was fifty-four years old at the time of the hearing.  He is six feet tall, and at that time, he weighed about 212 pounds.  He is a high school graduate.  He took diesel mechanic courses at a community college for a year-and-a-half after high school, but never received any type of certification.

Buyes stated he last worked about three-and-a-half years prior to the hearing, working part time at a gas station.  He held the

43 - FINDINGS & RECOMMENDATION

1  job for three-and-a-half months.  He left the job when he entered
2  a court-ordered, in-patient alcohol rehab program.  (A.R. 38-40)
3  He left the program three-and-a-half days early, which resulted in
4  a ten-day jail term.  (A.R. 41)

5       Buyes worked full time in shipping and receiving for two
6  different companies.  Both of those jobs ended due to his use of
7  alcohol, one when he returned from lunch smelling like alcohol, and
8  the other when he drank at lunch and then got into a fight with
9  another employee.  He also did a seasonal job from March to
10 September 2003, running "front-loaders," welding, and doing some
11 mechanic work.  (A.R. 41-42)

12      Buyes last looked for work about two years prior to the
13 hearing.  He has done a little carpentry work for friends, and some
14 repairs, painting, and the like for his brother-in-law's rental
15 properties.  Buyes testified he was capable of working at the time
16 of the hearing, just not at the same types of jobs he had done in
17 the past.  (A.R. 43-44)

18      Buyes stated he had been sober, for the most part, for about
19 three years.  He "fell off the wagon a couple of times," resulting
20 in a requirement that he call his probation officer three times a
21 week beginning in August 2009.  He does not use any type of street
22 drugs.  (A.R. 44-45)

23      Buyes had his first back surgery about twenty-five years ago,
24 to repair three herniated disks.  He had a second back surgery in
25 December 2008.   He stated his back condition continues to
26 deteriorate.  Back pain affects his ability to sit, stand, and
27 walk.  The pain radiates down both legs, all the way to the foot on
28 the right, and down to the knee on the left.  He estimated he could

44 - FINDINGS & RECOMMENDATION

walk about two blocks before he would need to rest, and he could stand for no more than ten to fifteen minutes at a time before needing a break.  (A.R. 46)  He estimated he could sit for fifteen to twenty minutes, and then would have to change positions or get up and stretch.  If he had a job that allowed him to take breaks as often as needed during the day, he estimated he could sit and stand for a total of four hours, each, in an eight-hour workday. (A.R. 47)

Buyes also has problems with pain in his shoulders, with the problem beginning about three years prior to the ALJ hearing. According to Buyes, he has limited use of his left arm, and problems gripping with both hands.  He stated he frequently drops things, giving examples of a cigarette lighter and silverware. (A.R. 47-48)

He has aching pain in both of his knees "constantly."  (A.R. 49)  The pain affects his ability to stand and walk.  If he kneels down, he has difficulty getting back up, and he has trouble walking up and down stairs.  (*Id.*)  Going up is worse than going down.  If there are many stairs, his "legs just get wore out," and he "run[s] out of strength."  (A.R. 61)

Buyes broke his left ankle in three places when he was in high school, and the ankle is still weak and "aches all the time." (A.R. 49)  He has continuous headaches almost every day.  When he was welding during one of his jobs, he developed a sensitivity to light. According to Buyes, his optometrist has suggested he wear sunglasses all of the time, even at night, because light causes him to have headaches.  He also gets headaches from gritting his teeth. Buyes stated he "take[s] a lot of ibuprofen or Tylenol."  (A.R. 50)

45 - FINDINGS & RECOMMENDATION

1  He stated his headaches affect his ability to do things, and he has
2  to lie down about ten percent of the time.  (*Id.*)

3      Buyes has prostate problems that cause him to have frequent
4  difficulty urinating.  He also has problems with diarrhea, and he
5  has had accidents and had to change his clothes "many times."
6  (A.R. 51)  He often has to shower and change clothes because he
7  does not make it to the bathroom in time.  He goes to the bathroom
8  five or six times a day due to the diarrhea, and he estimated he
9  would be in the bathroom and away from his work station as much as
10 an hour during an eight-hour workday.  (A.R. 51-52)

11     Buyes stated he has had trouble sleeping for about ten years.
12 On a good night, he gets five or six hour of sleep, and on a bad
13 night, he gets three or four hours of sleep.  (A.R. 52)  He also
14 has dizzy spells a couple of times a day, and during these spells,
15 he has to sit down and "not do anything."  (A.R. 53)

16     Buyes began having problems with depression in 1971.  Since
17 July 2005, depression has severely affected his level of interest
18 in activities.  When he gets depressed, he has no interest in doing
19 anything, cries a lot, and isolates himself.  Sometimes he spends
20 two or three days in his bedroom, not interacting with anyone and
21 only coming out to use the restroom.  He has suicidal thoughts at
22 times, but does not act on them.  He loses his appetite and
23 sometimes does not eat for two or three days.  Buyes stated that
24 two or three days a week, he has no ambition, energy, or strength,
25 and he just stays in bed.  He experiences feelings of guilt and
26 worthlessness.  He has significant problems concentrating and
27 thinking, and he becomes frustrated easily.  Others have told him
28 that he repeats himself frequently, though he is not aware of doing

46 - FINDINGS & RECOMMENDATION

so.  About once every two weeks, he thinks he hears someone calling his name, but there is no one there.  He has problems with anxiety, and has panic attacks when he is in large groups of people.  (A.R. 54-57)

Buyes has a history of problems with anger control and irritability.  He gets angry several times a day, every day, sometimes for just a few seconds and other times for several hours.  During these anger spells, Buyes cries easily and basically is not functional.  (A.R. 57-58)  Buyes had one psychiatric hospitalization, in about 1987, when he was suicidal and put a shotgun in his mouth.  His daughter and niece took him to the hospital.  (A.R. 54, 65)

Buyes stated when he was still working, he made adjustments to compensate for his medical conditions.  He changed position, getting up and down as needed, and he assigned "heavy" jobs to people he supervised.  He stated the gas station attendant job was the easiest job he has had in the past fifteen years, but he doubted he could return to that job due to "the constant walking back and forth . . . and bending."  (A.R. 59)  He stated his back pain and fibromyalgia have gotten worse since his last job ended.  He tosses and turns at night, and when he gets up in the morning, he is "[r]eally sore" and has no energy.  (A.R. 59-60)  About fifty percent of the time, he has numbness "from the waist to [his] knee on [his] left leg."  (A.R. 60)  He frequently has muscle spasms in his lower back.  (*Id.*)

Buyes stated he takes a one- to two-hour nap every day because he does not get enough sleep at night.  He stops and rests frequently, up to ten times a day, for ten to fifteen minutes at a

time.  (A.R. 61)  He changes position every five to fifteen minutes throughout the day to keep himself comfortable.  (A.R. 62)  He estimated he has "good days" only about twenty percent of the time. He considers a day a "good day" when his mood and pain level are better.  On a good day, he can be on his feet for ten to fifteen minutes at a time before taking a break, but on a bad day, that time period is reduced to five or ten minutes at a time.  Eight to ten times a day, for fifteen to twenty minutes at a time, he elevates his legs above hip level to try to relieve his back pain. (A.R. 63-64)  He is unable to bend at the waist without severe pain.  He has trouble reaching out or up with his left arm, because his left upper arm is always in pain.  (A.R. 64)

Buyes stated he used to enjoy fishing, hunting, camping, and other outdoor activities, but he is no longer able to do any of those activities.  He estimated he could lift a maximum of twenty pounds without causing problems for himself.  (A.R. 62)

Buyes estimated he can follow the action and remember what is happening in a movie or television show about seventy percent of the time.  As far as the pace at which he does things, he estimated his pace has declined to less than half of what it was when he was working full time.  (A.R. 67)  Buyes takes medications for his various conditions, and he experiences side effects from the medications including constipation, sexual dysfunction, and vision problems.  He sometimes experiences a sort of "tunnel vision type thing" that lasts about five minutes, and he has to sit down until it goes away.  His medications also make him drowsy, and he dozes off unexpectedly about once a week.  (A.R. 68-69)  Buyes estimated

48 - FINDINGS & RECOMMENDATION

that since 2005, about sixty percent of the time, his pain has been so bad that he has been unable to function.  (A.R. 69)

### 2. *Buyes's written testimony*

On September 29, 2007, Buyes completed a Function Report-Adult.  He indicated he was living "in a tent at a friend[']s house."  Regarding his daily activities, Buyes stated, "Drive to any and all appointments I have that day[;] then drive to the park and read the local paper and then gather pop cans from friends['] houses so I can have gas money and money to pay for my prescriptions that I take."  (A.R. 174)  He also feeds and waters his dog.  (A.R. 175)

Buyes stated he tosses and turns continuously all night due to pain in his hips, shoulders, knees, and back.  He is unable to reach and bend to bathe himself completely, and he sometimes has difficulty dressing himself due to stiffness and soreness.  He has trouble sitting on the toilet and wiping himself.  He stated that until his medications "kick in," he does not "move around much at all."  (*Id.*)  Buyes stated his friends and family constantly remind him to shower, change his clothes, and take better care of himself.  (A.R. 176)  He does not cook often because standing in one place for very long causes him pain.  (*Id.*)  He does not do house work or yard work because "[i]t hurts to[o] much to bend, squat, pivot, etc."  (A.R. 177)  He does his own shopping as needed, but buys very little at one time.  He does not have a checking or savings account, stating, "I can't hold a job very long to pay my bills." (*Id.*)

49 - FINDINGS & RECOMMENDATION

Buyes stated he used to enjoy outdoor activities such as fishing, crabbing, hunting, and bicycling, but he had not done any of those things for two years or more due to pain.  The only place he goes regularly is A.A. meetings.  He spends his time watching television, sitting at the park playing cards, and doing crossword puzzles.  (A.R. 178)  Buyes observes that when he is drinking, he argues over trivial things and does not get along well with others.  However, he indicated he has never been "a very social person," preferring to spend time alone.  (A.R. 179)

Regarding his functional abilities, Buyes stated his doctor had put him on a ten-pound lifting restriction, with no repetitive lifting.  He has problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, concen-trating, and completing tasks.  (*Id.*)  He follows written instruc-tions fairly well, and spoken instructions not quite as well, sometimes having to ask for instructions to be repeated.  (*Id.*)  He does not get along well with authority figures, and lost one job due to problems arguing with others.  He handles stress better when he is sober than when he is drinking.  (A.R. 180)  He noted that he sometimes has "night frights," waking up "cussing, kicking and sometimes screaming."  (*Id.*)

Buyes also completed an Alcohol and Drug Use Questionnaire on September 29, 2007.  At that time, he had been sober for ten months.  When he was drinking, it was "mostly high alcohol content beer," which he would start drinking when he got up in the morning, and continue drinking throughout the day.  (A.R. 182)  He would drink to the point of intoxication "every day and evening."  (*Id.*)  He stated his friends and family all agree he has a problem with

50 - FINDINGS & RECOMMENDATION

1  alcohol.   Drinking  has  caused  him  to  "be  in  and  out  of  jail
2  numerous  times,"  and  has  affected  his  ability  to  get  along  with
3  others,  and  even  to  take  care  of  his  own  basic  needs.  (*Id.*)  Buyes
4  indicated  he  "was  an  alcoholic  for  35  years."  (A.R. 184)

5      On  March  26,  2008,  in  connection  with  his  appeal,  Buyes  stated
6  he  was  unable  to  dress  himself  without  assistance,  and  his  girl-
7  friend  and  mother  helped  with  all  of  the  household  tasks.   He
8  stated  he  had  "no  strength  in  [his]  wrists."  (A.R. 204)

9      Buyes  completed  a  "Head  Injury  Questionnaire"  on  June  23,
10  2009.   The  questionnaire  is  a  checklist  of  symptoms  that  might
11  occur  after  a  head  injury.   Buyes  indicated  he  has  severe  problems
12  with  "[w]ord-finding,"  depression,  crying  spells,  loss  of  interest
13  in  usual  activities,  extreme  emotional  reactions,  mood  swings,
14  anxiety,  and  weakness.  (A.R. 211-12)  He  indicated  he  has  moderate
15  problems  with  back  pain,  insomnia,  fatigue,  low  energy,  lack  of
16  initiative,  low  motivation,  forgetfulness,  following  a  television
17  story,  remembering  what  he  has  read,  concentration  and  maintaining
18  attention,  reversing  numbers,  beginning  projects,  planning  activi-
19  ties,  getting  things  done,  short-  and  long-term  memory,  feeling
20  worthless  and  bored,  controlling  his  anger,  irritability,  impul-
21  siveness,  tolerating  frustration,  verbal  aggression,  impatience,
22  restlessness,  loss  of  senses  of  smell  and  hearing,  sensitivity  to
23  bright  light  and  noise,  nightmares,  reoccurring  dreams  of  "the
24  accident,"  attention  lapses,  racing  thoughts,  loss  of  libido,  poor
25  balance  and  coordination,  and  "[f]eelings  of  déjà  vu."  (*Id.*)  He
26  stated,  "I  have  no  drive,  problems  with  retaining  information,
27  emotional  problems,  hard  time  filling  out  paperwork,  hard  time
28

51 - FINDINGS & RECOMMENDATION

getting and keeping an erection, mood swings.  It effects [sic] all aspects of my life, personaly [sic] and socialy [sic].”  (A.R. 212)

Buyes completed a questionnaire regarding his headaches on February 2, 2010.  He indicated he had been suffering from head-aches for five years.  He has more than one headache per week, with pain in his “temples and sinus areas,” and lasting “most time up to 12 hours.”  (A.R. 218)  He rated the severity of his pain at 8/10. Just before a headache, he experiences changes in his vision and difficulty talking.  Stress, lack of sleep, and certain types of lights tend to bring on his headaches.  During a headache, he is irritable or hostile, confused, and has problems concentrating. (A.R. 219)  After a headache resolves, he feels exhausted and has to lie down for several hours.  According to Buyes, his doctors have opined his headaches are “mainly sinus headaches.”  (A.R. 220) To treat his headaches, he takes ibuprofen and Tylenol, uses cold packs, and massages his temples and sinus areas.  His doctors also prescribe antibiotics if he gets a sinus infection.  (*Id.*)

### D.   *Third-Party Testimony*

**1. *Sarah Hunt***

Buyes wanted to call Sarah Hunt as a witness at his ALJ hearing.  Hunt was present and ready to testify.  However, the ALJ directed Buyes’s attorney to submit Hunt’s testimony in writing, stating they had run out of time at the hearing.  (A.R. 69)

In her written statement, dated March 5, 2010, Hunt indicated she has known Buyes for four years, seeing him every day.  In her opinion, Buyes has marked difficulty (7/10) functioning; marked difficulty (8/10) performing his activities of daily living; marked

difficulty (7/10) with social functioning; marked difficulty (8/10) with concentration, persistence, or pace; and moderate difficulty (6/10) with episodes of decompensation. (A.R. 246-49) Hunt stated Buyes does not cook or clean; "has to be reminded to groom himself"; and requires assistance with his activities of daily living. (A.R. 247) Buyes will isolate himself, not answering the phone, eating, or coming out of his room "for 3 days at a time." (*Id.*) He avoids activities that would require him to interact with others. He "acts out inappropriately to strangers when they make comments that offend[] him," and he "has issues with authority figures." (*Id.*) According to Hunt, Buyes is unable to concentrate on a task for more than 45 minutes at a time. She stated "his frustration, anger, and the ability to forget what he is doing gets in the way and he gives up. He is slow paced, and has very little persistence. He is very repetitive in terms of short term memory." (A.R. 248) Hunt indicated Buyes has episodes of decompensation at least once a month, each lasting for three to four days. She stated, "These episodes include isolation, increased irritability and frustration, not eating, anger and he is very argume[n]tative. He has no concentration, persistence or pace of any sorts during the episode. He is also very emotional, weepy, and cries a lot." (A.R. 249)

Regarding Buyes's physical condition, Hunt stated he "cannot stand, sit, or lay down for any extended time. He has had 2 back surgeries and is due for another. He does not get fitful sleep [sic] due to changing positions frequently. Result in this is, he cannot work." (A.R. 251) She indicated Buyes "drops things due to decreased motor skills," and "walks with a limp and for more than

1 half the time stumbles." (A.R. 252)    Hunt indicated Buyes is
2 emotionally unstable, characterized by "crying, anger, and sadness
3 (e.g., he will be doing okay and then out of the blue start crying
4 for no apparent reason[)]." (*Id.*)

5

6 **2.    *Pat Thomas***

7    Pat Thomas appears to be Buyes's brother.  He completed a
8 written witness statement on March 1, 2010.  He indicated he sees
9 Buyes several times a day, noting Buyes lives with his parents.
10 (A.R. 221-22)   Thomas asks Buyes to help out on the property occa-
11 sionally, but Buyes complains often of back and leg pain, and "[i]t
12 is usually a burden on his body to help us out." (A.R. 222)
13 According to Thomas, Buyes "has a history of not being able to be
14 around people without totally irritating, annoying or just plain
15 being mean and angry." (*Id.*)  He opined Buyes has marked difficul-
16 ties in all functional areas.  He noted Buyes seems to care less
17 and less about his appearance, and is "usually depressed." (A.R.
18 223-24)    On those occasions when Buyes is not depressed, "he
19 totally changes and becomes very sarcastic." (A.R. 224)   Thomas
20 stated Buyes is always either complaining about his pain, or
21 "moving around and rubbing his back." (A.R. 226)  Thomas stated he
22 finds it "[v]ery frustrating" to be around Buyes because "you never
23 know what kind of mood he is in." (A.R. 227)

24

25 **3.    *Molly McGee***

26    McGee is Buyes's daughter.  She completed a written witness
27 statement on March 1, 2010.  In her opinion, Buyes is moderately
28 impaired in his activities of daily living, and markedly impaired

1  in all other functional areas.  She indicated Buyes "often

2  struggles with household chores," noting he is unable to "pick up

3  or carry anything heavier than about 20 pounds." (A.R. 230)  Buyes

4  is able to pick up his one-year-old granddaughter, but cannot carry

5  her around for an extended period of time.  McGee noted that when

6  Buyes is drinking, "he is impossible to be around," and even when

7  he is sober, it is difficult "to maintain a normal relationship"

8  with him. (A.R. 230)  She stated Buyes "can get very irritable and

9  withdrawn," and angers easily, causing her to limit his visitation

10 time with his grandchildren, and requiring that his visits with his

11 grandchildren be supervised. (*Id.*; A.R. 235)  She indicated Buyes

12 is unable to concentrate when she tells him things, and he becomes

13 distracted and angry easily.  She stated Buyes will repeat stories

14 he tells her several times when he visits. (A.R. 231)  According

15 to McGee, Buyes's pain level has worsened increasingly over the

16 past three to five years.  Emotionally, he has been "more sad,"

17 ending nearly every visit with crying. (A.R. 232)  She stated he

18 can be happy one minute, and withdrawn and angry or crying just a

19 few minutes later. (A.R. 235)  According to McGee, Buyes walks

20 unsteadily, and he "cannot sit in one position for more than a few

21 minutes at a time before he has to get up and re-situate himself.

22 He constantly holds or touches his back." (A.R. 234-35)

23

24 *4.  Jean C. Williams*

25      Williams is Buyes's mother.  She completed a written witness

26 statement on March 1, 2010.  She stated Buyes lives with her and

27 her husband, and she sees Buyes every day.  Williams opined Buyes

28 has moderate difficulties with his activities of daily living, and

55 - FINDINGS & RECOMMENDATION

with concentration, persistence, or pace; and marked functional
difficulties overall, but particularly with social functioning, and
with regard to episodes of decompensation. (A.R. 237-40) Williams
stated Buyes "has lived with me since my husband had brain surgery
in late 2008. I needed a backup. He's extremely moody and can't
always be depended upon as he is extremely pained at times and
complains of back, leg and arm aches - especially his back. He
seems to be in more pain than either my husband or me." (A.R. 238)

Williams indicated Buyes was in an accident in about 2006,
hitting his head, and his condition worsened afterwards. She
stated Buyes "has alienated his only brother, at times his sisters
and also his children. At times, I don't like his actions." (*Id.*)
According to Williams, Buyes is unable to concentrate for any
length of time; he requires reminders to do things; and he is
forgetful. She stated, "I don't ask him to do much as it seems to
bother him mentally and physically." (A.R. 239) Buyes seems
unable to sit or stand for long without changing positions, and he
"constantly complains of back and leg aches and pains." (A.R. 242)
Williams indicated Buyes has complained of back and leg pain for
years. He isolates himself from her, although he interacts well
with her husband "who has Parkinsons and glaucoma." (A.R. 240)
According to Williams, Buyes "walks very awkwardly most of the time
and has trouble carrying most objects." (A.R. 243) "His anger
tantrums are abnormal and he's happy one minute and almost crying
the next." (*Id.*) Williams opined that Buyes "is in worse shape
mentally and physically than either [her husband,] who is 84 with
glaucoma and Parkinsons[,] and [herself,] with osteoarthritis and
thyroid deficiency (almost 80)." (A.R. 244)

56 - FINDINGS & RECOMMENDATION

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966

57 - FINDINGS & RECOMMENDATION

1  (describing "work which exists in the national economy"), and
2  416.960(c) (discussing how a claimant's vocational background
3  figures into the disability determination).

4      The Commissioner bears the burden of proof at step five of the
5  process, where the Commissioner must show the claimant can perform
6  other work that exists in significant numbers in the national
7  economy, "taking into consideration the claimant's residual
8  functional capacity, age, education, and work experience." *Tackett*
9  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner
10 fails meet this burden, then the claimant is disabled, but if the
11 Commissioner proves the claimant is able to perform other work
12 which exists in the national economy, then the claimant is not
13 disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
14 §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

15     The ALJ determines the credibility of the medical testimony
16 and also resolves any conflicts in the evidence.  *Batson v. Comm'r*
17 *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
18 *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
19 Ordinarily, the ALJ must give greater weight to the opinions of
20 treating physicians, but the ALJ may disregard treating physicians'
21 opinions where they are "conclusory, brief, and unsupported by the
22 record as a whole, . . . or by objective medical findings."  *Id.*
23 (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
24 (9th Cir. 2001)).  If the ALJ disregards a treating physician's
25 opinions, "'the ALJ must give specific, legitimate reasons'" for
26 doing so.  *Id.* (quoting *Matney*).

27     The law regarding the weight to be given to the opinions of
28 treating physicians is well established.  "The opinions of treating

58 - FINDINGS & RECOMMENDATION

physicians are given greater weight than those of examining but non-treating physicians or physicians who only review the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003).   The *Benton* court quoted with approval from *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as follows:

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.    At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.   We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclu- sions.    Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

*Id.* (quoting *Lester, supra*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis.    *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combi- nation of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82.   If this . . . test is satis- fied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testi- mony about severity of symptoms [only] with

1           "specific findings stating clear and con-
2           vincing reasons for doing so." *Id.* at 1284.

3 *Batson*, 359 F.3d at 1196.

## B.   The ALJ's Decision

The ALJ found Buyes has not engaged in substantial gainful activity since his alleged onset date of July 2, 2005.  (A.R. 13) Buyes has severe impairments consisting of "status post lumbar spine decompression, cervical spine degenerative disc disease, fibromyalgia, mild bilateral carpal tunnel syndrom (CTS), major depression, post-traumatic stress disorder (PTSD), and alcohol and marijuana abuse in remission[.]"  (*Id.*)  He found Buyes has non-severe, medically-determinable impairments consisting of prostati-tis and a sleep disorder.  (A.R. 14)  The ALJ further found that none of Buyes's impairments, singly or in combination, meets or medically equals one of the listed impairments in the regulations. (*Id.*)

Specifically, the ALJ found Buyes's "lumbar and cervical spine impairments do not meet or medically equal listing 1.04 because [he] lacks the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or spinal stenosis resulting in pseudoclaudication."  (A.R. 14)  He found Buyes's carpal tunnel syndrome is not of Listing-level severity because Buyes "is able to perform fine and gross movements effectively as defined in the regulations."  (*Id.*)  He found Buyes's mental impairments do not meet the requirements of Listing 12.04, 12.06, or 12.09, noting Buyes has only mild difficulties with regard to his activities of daily living, and concentration, persistence or pace; and moderate

1 difficulties in social functioning; and he has not experienced any

2 episodes of decompensation of extended duration.  To meet the

3 Listing level of severity, his "mental impairments must result in

4 at least two of the following: marked restriction of activities of

5 daily living;  marked  difficulties  in  maintaining  social

6 functioning; marked difficulties in maintaining concentration,

7 persistence, or pace; or repeated episodes of decompensation, each

8 of extended duration."  (*Id.*)

9    The ALJ determined that Buyes has the RFC to perform light

10 work, with the following restrictions:

11        [T]he  claimant  must  be  given  a  sit/stand
         option, can frequently balance but can occa-
12        sionally climb ramps and stairs, stoop, kneel,
         crouch,  and  crawl,  can  frequently  handle  and
13        finger but should not reach overhead with the
         left arm, should avoid all exposure to hazards
14        due to past drug and alcohol abuse, and should
         have  occasional  contact  with  the  general
15        public and brief and structured contact with
         co-workers.

16

17 (A.R. 15)

18    The ALJ indicated he had considered Buyes's symptoms, and the

19 extent to which they were consistent with "the objective medical

20 evidence and other evidence."  (A.R. 15)  He found an inconsistency

21 in Buyes's report "that he spends the day driving to and from his

22 appointments and reading the newspaper, playing cards, and doing

23 crossword puzzles at a local park," when compared with his claims

24 on the head injury questionnaire that word-finding is "severely"

25 difficult, and concentration and memory are moderately difficult

26 for him.  (*Id.*)  He also found Buyes's testimony that "he can stand

27 or walk for 4 hours in an 8-hour workday and . . . lift 20 pounds,"

28 and his statement that "he believes that he is capable of working,

1  although he would not be able to perform his past work," to be
2  inconsistent with his claims regarding the limiting effects of his
3  "bowel and bladder control issues, high blood pressure, ankle pain,
4  headaches, and level of depression[.]"  (A.R. 16)  The ALJ also
5  questioned whether "these issues would persist during a longer
6  period of sobriety, which [Buyes] has not had."  (*Id.*)

7      The ALJ noted the four third-party witnesses' statements were
8  based on the witnesses' subjective observations of Buyes.  The ALJ
9  found the witnesses' conclusions regarding Buyes's low level of
10 functioning to be "unsupported by the medical evidence and even
11 [Buyes's] own hearing testimony, . . . in which he repeatedly
12 asserted that he believes himself capable of working."  (*Id.*)  The
13 ALJ concluded that although Buyes's medically-determinable impair-
14 ments could cause some of the symptoms he alleges, his subjective
15 complaints and the statements of the third-party witnesses "are not
16 credible to the extent they are inconsistent with the above [RFC]."
17 (A.R. 16-17)

18     The ALJ noted that in 2006, testing by a physical therapist
19 resulted "in a suggested impairment level of 4%[,] . . . [and
20 Buyes] was put in a sedentary to light exertional category with no
21 postural restrictions except for some limits on bending, squatting,
22 twisting, kneeling, and stair climbing.  (Ex. 2F) [i.e., A.R. 285-
23 93].  I find that this is consistent with the other evidence in the
24 record."  (A.R. 17)

25     The ALJ also found Dr. Barry's conclusions consistent with the
26 record.  When Dr. Barry did his 2006 psychological evaluation, he
27 concluded Buyes "may have depression, but it is not extreme and has
28 not caused major problems or impairments."  (A.R. 18)  The ALJ

1  found other mental health records also indicated Buyes does well
2  when he takes Paxil and sees a counselor as directed.  The ALJ gave
3  no weight to Dr. Sekiya's opinion that Buyes is unable to work full
4  time, noting the doctor's opinion was based, in part, on Buyes's
5  statement that "he had been sober for over two years, a statement
6  contradicted by the medical evidence and by [Buyes's] own statement
7  in September 2009 that he had used alcohol one month ago." (*Id.*)

8      The ALJ found Buyes is unable to perform any of his past
9  relevant work under the ALJ's RFC assessment.  However, he found
10 Buyes can make an adjustment to other work that exists in signifi-
11 cant numbers in the national economy.  Relying on the VE's
12 testimony, the ALJ gave examples of jobs Buyes could perform
13 including office helper, meter reader, and security guard. (A.R.
14 19-20)  The ALJ noted that although some of the VE's testimony was
15 inconsistent with information contained in the DOT, the VE provided
16 a reasonable explanation for the discrepancy; i.e., the VE had used
17 more recent sources as the basis for his opinions. (A.R. 19-20)
18 Because the ALJ found there are jobs Buyes can perform, he found
19 Buyes not to be disabled at any time through April 2, 2010. (A.R.
20 20)

21

22                    *IV.   STANDARD OF REVIEW*

23      The court may set aside a denial of benefits only if the
24 Commissioner's findings are "'not supported by substantial evidence
25 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
26 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
27 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
28 *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1

63 - FINDINGS & RECOMMENDATION

1   (9th Cir. May 20, 2011).  Substantial evidence is '"more than a

2   mere scintilla but less than a preponderance; it is such relevant

3   evidence as a reasonable mind might accept as adequate to support

4   a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,

5   1039 (9th Cir. 1995)).

6       The court "cannot affirm the Commissioner's decision 'simply

7   by isolating a specific quantum of supporting evidence.'"  *Holohan*

8   *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

9   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

10  must consider the entire record, weighing both the evidence that

11  supports the Commissioner's conclusions, and the evidence that

12  detracts from those conclusions.  *Id.*  However, if the evidence as

13  a whole can support more than one rational interpretation, the

14  ALJ's decision must be upheld; the court may not substitute its

15  judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

16  *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

17

18                        *V.   DISCUSSION*

19                  *A.   Severity of Impairments*

20      Buyes argues the ALJ erred in finding his impairments do not

21  meet or medically equal any listed impairment.  Dkt. #23, pp. 20-

22  24; Dkt. #30, pp. 1-4.  Buyes notes the ALJ specifically found his

23  back condition does not meet Listing 1.04, but he argues the ALJ

24  ignores "the other criteria that would categorize [Buyes's]

25  symptoms *possibly meeting* Listing 1.00."  Dkt. #23, p. 21 (emphasis

26  added).  Buyes argues the ALJ made a medical judgment rather than

27  obtaining testimony from a medical expert, and the ALJ ignored

28  Buyes's medical evidence showing his back condition meets the

64 - FINDINGS & RECOMMENDATION

1 Listing level of severity.  Buyes argues the ALJ failed to develop
2 the Record fully and fairly, and "at the least" should have
3 obtained a medical consultative report.  *Id.*, pp. 21-24.

4      Buyes further argues the ALJ erred in finding his mental
5 impairment does not equal Listing 12.04.  Specifically, he asserts
6 the ALJ failed to take into account the combined effect of his
7 physical and mental impairments, and again, failed to obtain a
8 medical expert's opinion in making the determination.  *Id.*, pp. 23-
9 24.

10      The Listing of Impairments appears in 20 C.F.R. part 404,
11 subpart P, appendix 1, which describes "various physical and mental
12 illnesses and abnormalities, most of which are categorized by the
13 body system they affect."  *Sullivan v. Zebley*, 493 U.S. 521, 529-
14 30, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990).  In *Zebley*, the
15 Supreme Court explained that each of the Listed impairments "is
16 defined in terms of several specific medical signs, symptoms, or
17 laboratory test results."  *Id.*, 493 U.S. at 530, 110 S. Ct. at 891.
18 The Court held, "For a claimant to show that his impairment matches
19 a listing, it must meet *all* of the specified medical criteria.  An
20 impairment that manifests only some of those criteria, no matter
21 how severely, does not qualify."  *Id.* (emphasis in original);
22 *accord Brown v. Astrue*, 405 Fed. Appx. 230, 232 (9th Cir. 2010).

23      With regard to Buyes's physical impairments, the ALJ found
24 Buyes's back condition does not result in the particular deficits
25 required to meet Listing 1.04.  (A.R. 14)  Listing 1.04 pertains to
26 "[d]isorders of the spine . . . resulting in compromise of a nerve
27 root . . . or the spinal cord."  20 C.F.R. pt. 404, subpt. P,
28 app. 1, § 1.04.  The Listing describes three groupings of symptoms

65 - FINDINGS & RECOMMENDATION

and objective findings necessary to meet its requirements, as follows:

    A.  Evidence of nerve root compression character-
        ized by neuro-anatomic distribution of pain,
        limitation of motion of the spine, motor loss
        (atrophy with associated muscle weakness or
        muscle weakness) accompanied by sensory or
        reflex loss and, if there is involvement of
        the lower back, positive straight-leg raising
        test (sitting and supine);

        or

    B.  Spinal arachnoiditis, confirmed by an opera-
        tive note or pathology report or tissue
        biopsy, or by appropriate medically acceptable
        imaging, manifested by severe burning or
        painful dysesthesia, resulting in the need for
        changes in position or posture more than once
        every 2 hours;

        or

    C.  Lumbar spinal stenosis resulting in pseudo-
        claudication, established by findings on
        appropriate medically acceptable imaging,
        manifested by chronic nonradicular pain and
        weakness, and resulting in inability to ambu-
        late effectively, as defined in 100B2b.

*Id.*, § 1.04(A)-(C). The ALJ specifically found Buyes's "lumbar and cervical spine impairments do not meet or medically equal listing 1.04 because [he] lacks the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or spinal stenosis resulting in pseudoclaudication." (A.R. 14)

Buyes argues the ALJ ignored medical records, two MRIs, and the third-party witness statements evidencing his "inability to ambulate effectively, his chronic back pain, and his diagnoses of degenerative disc disease and vertebral fractures that cause weakness and problems with ambulating effectively[.]" Dkt. #23, p. 21. The regulations explain that an "[i]nability to ambulate effectively means an extreme limitation of the ability to walk," in

66 - FINDINGS & RECOMMENDATION

general without using "a hand-held assistive device(s) that limits the functioning of both upper extremities" (e.g., a cane or a walker). *Id.*, § 1.00(B)(2)(b)(1). The regulations give examples of ineffective ambulation including, without limitation:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.*, § 1.00(B)(2)(b)(2). The evidence of Record does not demonstrate that Buyes has an "inability to ambulate" even approaching the level of severity contemplated by the regulations. In addition, Buyes's statements regarding the limiting effects of his back pain are inconsistent with his reported activities. In September 2007, Buyes reported problems performing self-care activities due to pain in his hips, shoulders, knees, and back, and he stated he did not cook or do housework due to pain. However, in September 2007, he was seen in the emergency room for an exacerbation of chronic low back pain due to moving furniture, and painting while on a ladder. Those are not the types of activities that would be undertaken by someone who is completely disabled by pain. The objective evidence does not demonstrate that Buyes's back impairment rises to the Listing level of severity.

With regard to Listing 12.04, pertaining to affective disorders, Buyes argues the ALJ failed to take into account the combined effect of his mental and physical impairments in determining whether his mental impairment equals the Listing. He argues the ALJ was required to obtain the testimony of a medical

67 - FINDINGS & RECOMMENDATION

consultant in making such a determination. To meet Listing 12.04, a claimant must either meet the requirements of both paragraphs A and B, or the requirements of paragraph C. Paragraph A requires "[m]edically documented persistence, either continuous or inter-mittent," of specific symptoms. Relevant to the current discussion are the symptoms in paragraph A(1), to-wit:

> Depressive syndrome characterized by at least four of the following: (a) Anhedonia or per-vasive loss of interest in almost all activi-ties; or (b) Appetite disturbance with change in weight; or (c) Sleep disturbance; or (d) Psychomotor agitation or retardation; or (e) Decreased energy; or (f) Feelings of guilt or worthlessness; or (g) Difficulty concentra-ting or thinking; or (h) Thoughts of suicide; or (i) Hallucinations, delusions or paranoid thinking[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(A)(1). The ALJ did not make a specific finding as to whether Buyes's symptoms meet the requirements of paragraph A; however, the evidence indicates he has experienced ongoing symptoms of anhedonia, appetite disturbance with weight change, sleep disturbance, decreased energy, feelings of worthlessness, difficulty concentrating, and suicidal thoughts.

Paragraph B requires that an individual's symptoms result "in at least two of the following: (1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentra-tion, persistence, or pace; or (4) Repeated episodes of decom-pensation, each of extended duration[.]" *Id.*, § 12.04(B). The ALJ found Buyes has mild restriction of the activities of daily living; mild difficulties maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and no qualifying episodes of decompensation. (A.R. 14) Thus, the ALJ

1 concluded Buyes's impairment does not meet the paragraph B
2 criteria.

3     Where Buyes urges error in this analysis is the ALJ's failure
4 to consider the combination of Buyes's physical and mental impair-
5 ments in determining whether his condition is equivalent to Listing
6 12.04.  Buyes relies on *Lester v. Chater*, 81 F.3d 821 (9th Cir.
7 1995), where the court held that where "the effects of [a
8 claimant's] physical and mental limitations are inseparable from a
9 medical standpoint, and thus are inextricably linked," it is an
10 error of law for the ALJ to consider the claimant's physical and
11 mental impairments in isolation from each other in determining
12 whether his condition meets the paragraph B criteria.  *Lester*, 81
13 F.3d at 829-30 & n.6.  Rather, the ALJ must consider "the combined
14 effect of the claimant's physical and mental impairments in deter-
15 mining whether the functional criteria listed in paragraph B were
16 satisfied."  *Id.*, 81 F.3d at 830.

17     *Lester*, however, is distinguishable from the present case.  In
18 *Lester*, the ALJ had concluded the claimant's "pain and depression
19 were 'symptoms and signs' of [his] back impairment and were not
20 symptoms and signs of any alleged mental impairment[.]"  *Id.*, 81
21 F.3d at 829.  Lester's "chronic pain syndrome" had both physical
22 and psychological components, such that "[p]ain merges into and
23 becomes a part of the mental and psychological responses that
24 produce the functional impairments.  The components are not neatly
25 separable."  *Id.*  It was because "the consequences of Lester's
26 physical and mental impairments [were] so inextricably linked" that
27 the ALJ had to "consider whether these impairments *taken together*

28

69 - FINDINGS & RECOMMENDATION

1  result[ed] in limitations equal in severity to those specified by
2  the listings." *Id.*, 81 F.3d at 829-30 (emphasis in original).

3      In contrast, in the present case, Buyes's physical and mental
4  conditions are distinct from one another.  Although it seems likely
5  that Buyes's back pain could contribute to his depression, none of
6  his treating doctors has suggested that if his back pain were
7  eliminated, his depression would cease.  Indeed, the evidence
8  suggests his depression would continue, to some degree, even if his
9  back pain resolved.  A couple of examples will illustrate this
10 conclusion.  It is apparent from the Record that Buyes's
11 depression, historically, has been linked to his alcohol abuse
12 without regard to whether he was experiencing problems with his
13 back.  For example, when Buyes first began his relationship with
14 the Yamhill County Adult Mental Health Program, in January 2005, he
15 was only complaining of issues related to his alcohol abuse and
16 depression.  Although, under "Current Medical Problems," the
17 evaluation states, "He has back problems, stomach problems and
18 periodic headaches," Buyes did not discuss those issues or relate
19 them to his depression.  (A.R. 535)  His Axis III diagnoses are
20 listed as "Back problems, stomach problems, headaches - possibly
21 related to stopping drinking, possibly stress related." (A.R. 537)
22 But nothing in the evaluation indicates that either Buyes or the
23 evaluator considered any nexus between Buyes's back problems and
24 either his alcohol abuse or his depression.  Similarly, when he had
25 a comprehensive psychiatric assessment in March 2005, although the
26 psychiatrist noted that Buyes's medical history included "Chronic
27 Back pain, S/P surgery 1990 for three Herniated Disks," "Bursitis
28 in Knees bilaterally," and "History of elevated liver enzymes,"

1  there is no indication that his depressive disorder was in any way
2  related to his medical problems, or specifically to his back pain.
3  (A.R. 529-31)

4      Again, in November 2006, when Buyes underwent a psychological
5  evaluation at the request of Vocational Rehabilitation Services,
6  Buyes, himself, described his reduced activity level and sporadic
7  employment history in relation to problems with anger management,
8  alcohol abuse, and not always taking his medication as prescribed.
9  The Record is replete with similar evidence that Buyes's physical
10 and mental impairments are not inextricably intertwined, as the
11 claimant's impairments were in *Lester*. As a result, I find the ALJ
12 did not err in failing to consider the combination of Buyes's
13 physical and mental impairments in determining that his mental
14 impairments do not meet or equal any listed impairment.

15     Buyes further argues the ALJ erred in failing to obtain expert
16 medical testimony in evaluating whether Buyes's impairments meet or
17 equal the Listing level of severity. "'In Social Security cases,
18 the ALJ has a special duty to fully and fairly develop the record
19 and to assure that the claimant's interests are considered.'"
20 *Hayes v. Astrue*, 270 Fed. Appx. 502, 504 (9th Cir. 2008) (quoting
21 *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam)).
22 "This duty exists even when the claimant is represented by
23 counsel." *Id.* However, if the record evidence is unambiguous, and
24 is sufficient to allow for proper evaluation, then the duty to
25 develop the record further is not triggered. *See, e.g.*, *Loeks v.*
26 *Astrue*, slip op., 2011 WL 198146, at *5 (D. Or. Jan. 18, 2011)
27 (Haggerty, J.) (citing *Mayes v. Massanari*, 276 F.3d 453, 459-60
28 (9th Cir. 2001)); *Frampton v. Astrue*, slip op., 2010 WL 373867, at

1  *13 (D. Or. Jan. 29, 2010) (Mosman, J.) (same). Here, Buyes has
2  failed to show how the evidence is ambiguous, or otherwise
3  insufficient to an extent that would have required the ALJ to
4  obtain expert medical testimony.

5      Buyes further argues the ALJ erred in failing to give
6  controlling weight to the questionnaire completed by Dr. Sekiya,
7  and in considering the severity of Buyes's self-harmful behavior.
8  However, Buyes's treating sources, themselves, never pointed to his
9  self-harmful behavior as evidencing any particular diagnosis, nor
10 did any treating source focus on that behavior in formulating an
11 appropriate course of treatment. With regard to the weight the ALJ
12 gave the checklist-type form completed by Dr. Sekiya, the ALJ noted
13 that opinions indicated on the form were inconsistent with the
14 doctor's own treatment notes that indicated Buyes was doing well on
15 his medication regimen.

16     Buyes also argues the ALJ erred in concluding that because
17 Buyes did not take Paxil as prescribed, he must not be as disabled
18 as he claims. Dkt. #23, pp. 24-27. Throughout the progress notes
19 from Buyes's treating sources, Buyes consistently reported that his
20 symptoms improved and he was able to keep himself on an "even keel"
21 when he took Paxil as prescribed. Nevertheless, he would stop
22 taking the medication when he began feeling better, and often
23 allowed himself to run out of the medication without seeking a
24 refill for several weeks at a time. In evaluating a claimant's
25 credibility, an ALJ is entitled to consider the extent to which a
26 claimant follows a prescribed course of treatment. *See, e.g.*, *Fair*
27 *v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

28

72 - FINDINGS & RECOMMENDATION

1  In summary, the court finds the ALJ did not err in his
2  evaluation and treatment of the medical evidence of record.

3

4                    **B.  *The ALJ's RFC Formulation***

5       Buyes argues the ALJ failed to follow the applicable regula-
6  tions and Social Security Rulings in formulating his RFC.   In
7  particular, he claims "the ALJ's RFC findings are contrary to SSR
8  96-8p[,]" the requirements of which are "mandatory."   Dkt. #23,
9  pp. 28-30.  The policy interpretation in question explains that the
10 RFC assessment considers "an individual's ability to do sustained
11 work-related physical and mental activities in a work setting on a
12 regular and continuing basis"; i.e., "8 hours a day, for 5 days a
13 week, or an equivalent work schedule."   SSR 96-8P, ¶ 1 (available
14 at 1996 WL 374184 (July 2, 1996)).  The RFC assessment determines
15 the greatest level of activity an individual can do despite
16 limitations and restrictions.  *Id.*, ¶ 5.  In order to assess an
17 individual's RFC, the ALJ "must first identify the individual's
18 functional limitations or restrictions and assess his or her work-
19 related abilities on a function-by-function basis. . . .   Only
20 after that may RFC be expressed in terms of the exertional levels
21 of work, sedentary, light, medium, heavy, and very heavy."   *Id.*,
22 ¶ 4.

23      Buyes argues the ALJ failed to discuss all of his functional
24 abilities properly, as they would relate to sustained work activity
25 for eight hours a day, five days a week; in particular, his
26 problems with concentration and stamina, the requirement that he
27 "work at a reduced pace," the reports of his self-injuries, his
28 back pain, "and at least 4 or more days of missing work."   Dkt.

73 - FINDINGS & RECOMMENDATION

1 #23, p. 29.   Buyes argues the ALJ's failure "to provide a
2 'functional analysis' as required by 20 CFR § 416.945, and SSR 96-
3 8p," constitutes reversible error.  *Id.*  The ALJ discussed Buyes's
4 relevant medical history, noting inconsistencies between Buyes's
5 claim that he is disabled and his reports to his doctors.   In
6 addition, the ALJ relied on Buyes's own testimony that he is able
7 to work, just not in any of his previous jobs.  Although an ALJ has
8 a duty to weigh all of the record evidence, the ALJ "is not
9 required to discuss each piece of evidence." *Cole v. Astrue*, 395
10 Fed. Appx. 387, 389 (9th Cir. 2010).  Here, the court finds the ALJ
11 properly weighed the evidence, and gave sufficient justification
12 for his findings regarding Buyes's functional abilities, and for
13 finding Buyes's subjective testimony not to be fully credible.
14 (*See* A.R. 15-18)  The ALJ does not need to prepare "a function-by-
15 function analysis for medical conditions or impairments that the
16 ALJ found neither credible nor supported by the record[.]" *Bayliss*
17 *v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

18     Buyes further argues the ALJ grossly mischaracterized the
19 evidence when he stated that 2006 testing by a physical therapist
20 resulted "in a suggested impairment level of 4%[,] . . . [and
21 Buyes] was put in a sedentary to light exertional category with no
22 postural restrictions except for some limits on bending, squatting,
23 twisting, kneeling, and stair climbing."  *Id.*, p. 28.   The
24 evaluator in question opined Buyes had a "whole person impairment
25 level [of] 4%" based on applicable AMA guidelines." (A.R. 292)  He
26 noted Buyes did not tolerate bending, squatting, twisting, crawling
27 and kneeling well, and those activities increased pain in his low
28 back and knees.  He also imposed lifting restrictions.  However, he

1  noted Buyes tolerated walking, reaching, and grasping tasks well.
2  (A.R. 292-93)  The court finds the ALJ accurately summarized the
3  findings from the 2006 testing.

4       Buyes also argues that because the RFC assessment was faulty,
5  the VE's testimony based on that RFC cannot constitute substantial
6  evidence to support the ALJ's decision.  Dkt. #23, p. 30.  Because
7  the court has found that the ALJ's RFC assessment was proper, and
8  because the ALJ included those limitations he found credible in the
9  hypothetical question to the VE, the ALJ was entitled to rely upon
10 the VE's testimony for the ALJ's step five findings.  *See, e.g.,*
11 *Bayliss*, 427 F.3d at 1217-18 (ALJ may rely on VE's response to
12 hypothetical question containing limitations the ALJ finds credible
13 and supported by substantial evidence in the record).

14

15                        *VI.  CONCLUSION*

16      In conclusion, I find Buyes has failed to show the ALJ erred
17 in finding he was not disabled.  The ALJ's conclusion is based on
18 substantial evidence in the Record, and the ALJ applied the proper
19 legal standards in his evaluation of the evidence.  I therefore
20 recommend the Commissioner's decision be affirmed.

21

22                     *VII.  SCHEDULING ORDER*

23      These  Findings  and  Recommendations  will  be  referred  to  a
24 district judge.  Objections, if any, are due by **September 14, 2012.**
25 If no objections are filed, then the Findings and Recommendations
26 will go under advisement on that date.  If objections are filed,
27 then any response is due by **October 1, 2012.**  By the earlier of the

28

75 - FINDINGS & RECOMMENDATION

1  response due date or the date a response is filed, the Findings and

2  Recommendations will go under advisement.

3        IT IS SO ORDERED.

4                              Dated this 27th day of August, 2012.

5

6                              /s/ Dennis J. Hubel

7                              _____

8                              Dennis James Hubel
                               Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

76 - FINDINGS & RECOMMENDATION